**George GOFF, Terry Schertz, David D. Heaton, Plaintiffs,**

v.

**Crispus NIX, et al., Defendants.**

**Civ. No. 84–129–E.**

United States District Court, S.D. Iowa, C.D.

Dec. 21, 1984.

Barbara Schwartz, Prisoner Assistance Clinic, Iowa City, Iowa, for plaintiffs.

John Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

DONALD E. O'BRIEN, Chief Judge.

This case was tried to the Court on the grounds of the Iowa State Penitentiary (ISP) at Fort Madison, Iowa. Previously, the Court granted Plaintiff Goff part of his requested preliminary injunction which enjoined certain visual body cavity (vbc) searches at ISP.[1] After trial, the Court permanently enjoins the defendants in substantially the same way as set out in the

preliminary injunction order with some modifications.

## I. *FINDINGS OF FACT*

At the beginning of the preliminary injunction evidentiary hearing, the parties stipulated to certain facts. Transcript, March 15, 1984 Hearing pp. 9–12 (hereinafter Tr. ——). The Court summarized the stipulated facts in the preliminary injunction order. *Goff v. Nix,* Civil No. 84–129–E, slip op. 4–9 (S.D.Iowa March 22, 1984). The Court incorporates the summary of stipulated facts by reference with two clarifications.

First, the paragraph enumerated 2 should read as follows:

2. When an inmate from cellhouse 20 is to be taken to the exercise area, he hands his clothes to an officer standing outside his cell. The clothes are then shaken down and handed back. The inmate is then taken to a shower and strip searched.

The testimony at trial shows that strip searches conducted prior to exercise did not include a vbc search.

Second, the paragraph enumerated 12 should read as follows:

12. One tower, Tower 7, has responsibility for viewing the four 319 exercise pens as well as other areas.

The Court will not restate all of the Findings of Fact which it made in the preliminary injunction order. In that Order, the Court reserved the right to make additional findings; thus, the Court supplements those findings as follows:

Plaintiffs do challenge the visual anal cavity search which is set forth in Policy No. 84–3–2–567, Procedure B., 10.[2] This

---

1. On April 16, 1984, Judge Stuart ordered that three cases before him concerning anal body cavity searches be consolidated with this case, *Goff v. Nix,* Civil No. 84–129–E. The three cases were *Schertz v. Nix,* Civil No. 84–212–A; *Heaton v. Nix,* Civil No. 84–214–A; and *Sharp v. Nix,* Civil No. 84–61–A. After input from the attorneys, the Court decided to address squat-and-cough cases with claimed money damages separately. Consequently, this Court severed the case of *Derl Sharp v. Nix,* Civil No. 84–61–A,

which Judge Stuart had consolidated with this action.

2. It is important to note what procedures are not being challenged in this lawsuit. The bend-and-spread procedure is set forth in ISP Policy No. 84–3–2–567 entitled "Strip Search: Inmates." Plaintiff's Exhibit 1. The use of strip searches is not challenged. Furthermore, the procedure which requires guards to

procedure provides that the inmate is to be searched by a member of the same sex in an area as private as is possible, without jeopardizing the safety of the searcher or the effectiveness of the search. The inmate's anal cavity is not to be physically probed nor is the inmate touched by the searcher during the search.

The Court further finds that a visual body cavity search which requires the inmate to bend over and spread his buttocks so that the anus is visible to the searcher is intrusive, degrading, humiliating, embarrassing, and greatly increases an inmate's feelings of vulnerability. The Court further finds that these feelings of humiliation, degradation, and vulnerability are increased when a vbc search is accompanied by verbal harassment from the correctional officer(s) conducting the search. Such verbal harassment during a vbc search, including comments with homosexual references or allusion, does not further or promote any institutional security concern and is totally without legitimate purpose. Indeed, verbal harassment during a vbc search has a negative impact upon the security of ISP in that it causes some inmates to become more resentful, more hostile, and more likely to rebel against other assertions of authority. Thus, verbal harassment causes an increase in the tensions at ISP. The evidence and the reasonable inferences therefrom show that many of the correctional officers at ISP perform the vbc searches in an orderly manner without verbal harassment. However, the Court finds that some correctional officers, in some situations, conduct vbc searches in less than an appropriate manner. In other words, the evidence showed that some vbc searches are accompanied by teasing, rude and offensive comments, and other verbal harassment.

In the preliminary injunction Order,[3] the Court granted authority to ISP officials of the status of Security Director or above to conduct a vbc search of an inmate upon "a reasonably clear indication that an inmate is actually concealing something in a body cavity." To date, the Court has received no notice that this authority has been used despite the injunction.

The Court finds that vbc searches are ineffective in revealing contraband except in cases where a string or part of the item hidden is protruding from the anus or where signs such as excess lubricant, blood or feces are present. Where such signs are observable during a strip search, further inspection including the use of a vbc search would be permitted after approval by the Security Director or higher official. A vbc search will not reveal contraband completely hidden in the rectal cavity.

Security Director John Emmett testified that segregated inmates are vbc searched after, but not before, their exercise. At times during the exercise period, sixteen inmates are in the exercise pens and are watched by two guards, one of whom is in the tower. This occurs when four other guards are escorting inmates to or from the exercise pen. Otherwise, these four guards are observing the exercise pens.

The Court and the parties inspected the penitentiary premises; for an inmate to escape from the new visiting room at ISP, he would have to get by four locked doors, two sliding type and two with guard controlled locks. Four locked doors also protect the infirmary. Inmates taken to the infirmary are under constant supervision and are in restraints unless the treatment requires otherwise. Additionally, segregated inmates are prevented from having access to general population inmates while in the infirmary. The claimed justification for requiring a vbc search after an infirmary visit is that the administration does not have total control over who provides health care because these services are rendered under contract. Defendants are concerned that the company providing health care ser-

---

Have subject lift penis and scrotum to inspect the crotch area.
Policy No. 84–3–2–567, Procedure B., 8, is not challenged.

3. Page 11, ¶ (d).

vices may bring in a new doctor or a specialist who does not fully appreciate the security rules. In view of the other security measure surrounding infirmary visits, the Court finds that this security concern is exaggerated and does not justify use of the vbc search before or after such visits.

The justification for vbc searching an inmate before he goes to the visiting room is that he may take a weapon into the visiting room and use the weapon to take a hostage or attack someone. The Court enjoined vbc searches before contact visits with attorneys, legal interns, clergy, the prison chaplain, and the ombudsman. Vbc searches before other contact visits were not enjoined. The Court finds that the chance that an inmate would wish to attack an attorney, chaplain, clergyman or ombudsman is exceedingly remote and the evidence showed no history of any such attack. Second, because of the security measures which are readily apparent to the inmates, the possibility that an inmate would try to take a hostage as a way to escape from the visiting room is also remote. The Court finds the use of a vbc search prior to these visits is an exaggerated response to these security concerns.

The defendants' justification for searching an inmate after one of these five types of contact visits is that the visitor might give the inmate contraband which the inmate could hide in his rectal cavity and take back into the prison. There is no indication that these types of visitors have attempted smuggling in the past. For this concern to actually happen, the visitor would have to get the contraband into the institution without being detected, the item would have to be removed for its hiding place and then passed to the inmate, and the inmate would have to then conceal it in his rectal cavity. The chances of this sequence of events happening and going undetected is quite remote. First, attorneys, clergy, chaplains, legal interns, and the ombudsman are not the type of people who smuggle contraband to inmates. Second, the surveillance makes it nearly impossible for an item to be hidden by the inmate in his rectal cavity. Inmates do not wear their own prison garb on a visit; they are given "visiting clothing" after the strip search which is conducted prior to the visit. Thus, the clothes worn for a visit will not be split or torn to give the inmate easy access to his rectal cavity. After the visit is over, the prisoners are taken back to a private area, the "visiting clothing" is removed, and they are again strip searched.

Finally, the squat-and-cough search procedure is no longer condoned by the administration of ISP. The Court finds that the squat-and-cough search procedure is an ineffective type of anal body cavity search which accomplishes nothing other than to degrade and humiliate the inmate recipient. See Tr. 210.

## II. CONCLUSIONS OF LAW

■ The Fourth Amendment provides in pertinent part:

The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ....

The Fourth Amendment protects people, not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Thus, individuals retain the right to be free from "unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). To pass muster under the Fourth Amendment, a search must be reasonable. "Reasonableness" is determined by balancing the intrusiveness of the search on the individual's Fourth Amendment interest against the search's promotion of legitimate government interests. *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). In the context of visual body cavity searches, the Supreme Court has stated:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights

that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

■ The Court adopts the following method of analyzing "reasonableness" under the Fourth Amendment.

  1. Does the inmate have a legitimate expectation of privacy?

  (a) Have the inmates exhibited an actual (subjective) expectation of privacy?

  (b) Is that expectation one which society is prepared to recognize as "reasonable"?

  2. Do the challenged searches promote legitimate governmental interests?

*See Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

■ Defendants urge this Court to extend the holding in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), relating to a prisoner's cell to a prisoner's body. In that case the Supreme Court held

that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.

*Id.* at ——, 104 S.Ct. at 3200. Defendants argue that an inmate retains no reasonable expectation of privacy in his body. The Court disagrees. The Court finds that the inmates have an actual expectation of privacy but that their subjective expectations are significantly diminished by the fact that they are incarcerated. Next, the Court concludes that society recognizes a legitimate expectation of inmates that they be free from excessive and unwarranted searches of a highly intrusive nature. The Supreme Court has set forth the general principal that

convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.

*Bell v. Wolfish*, 441 U.S., at 545, 99 S.Ct., at 1877. Thus, this Court concludes that inmates do retain some of the Fourth Amendment's protections while incarcerated.

Having concluded that the Fourth Amendment is applicable to protect the integrity of an inmate's body, the next step is to consider the justifications asserted for the vbc searches. At this point, the Court turns to the amount of deference which the judiciary should accord those officials responsible for the day-to-day operation of a penal institution. In *Bell v. Wolfish, supra,* the Supreme Court stated:

Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. (Cites and footnote omitted). "Such considerations are peculiarly within the province and professional expertise of correction officials and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495.

This idea of judicial deference does not, however, mean that the authority of prison administrators is unchecked by the United States Constitution. Indeed, in *Bell v. Wolfish,* 441 U.S., at 546, 99 S.Ct., at 1878, Justice Rehnquist stated:

There must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell, supra,* 418 U.S. 539 at 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935.

While this Court appreciates the policy concerns justifying the idea of judicial deference, the Court also recognizes that the

purpose of the Bill of Rights is to enshrine certain fundamental principles beyond the reach of governmental officials or legislative majorities. *Hudson v. Palmer,* 468 U.S. at ——, 104 S.Ct. at 3215 (Stevens, J., dissenting). Furthermore, this Court shares the views of Justice Blackmun when he stated:

> I am concerned about the [Supreme] Court's apparent willingness to substitute the rhetoric of judicial deference for meaningful scrutiny of constitutional claims in the prison setting. *See Rhodes v. Chapman,* 452 U.S. 337, 369 [101 S.Ct. 2392, 2410, 69 L.Ed.2d 59] (1981) (opinion concurring in the judgment). Courts unquestionably should be reluctant to second-guess prison administrators' opinions about the need for security measures; when constitutional standards look in whole or in part to the effectiveness of administrative practices, good-faith administrative judgments are entitled to substantial weight. The fact that particular measures advance prison security, however, does not make them *ipso-facto* constitutional. *Cf. Bell v. Wolfish,* 441 U.S., at 539, n. 20 [99 S.Ct., at 1874 n. 20]. I recognize that constitutional challenges to prison conditions, like similarly expansive challenges to the workings of other institutions, pose a danger of excessive judicial intervention. At the same time, however, careless invocations of "deference" run the risk of returning us to the passivity of several decades ago, when the then-prevailing barbarism and squalor of many prisons were met with a judicial blind eye and a "hands off" approach. As we recognized in *Bell v. Wolfish,* the fact that initial responsibility for the Nation's prisons is vested in prison administrators "does not mean that constitutional rights are not to be scrupulously observed." *Id.,* at 562 [99 S.Ct., at 1886]

*Block v. Rutherford,* —— U.S. ——, ——, 104 S.Ct. 3227, 3236, 82 L.Ed.2d 438 (1984) (Blackmun, J., concurring in judgment). In short, there is a constitutional line which constrains the discretion of prison administrators.

■ The Court concludes that consideration of the promotion of legitimate governmental interests should be analyzed in the context of when and where the vbc search is used. In *Bell v. Wolfish,* the Supreme Court set forth four factors which a court must consider in performing the Fourth Amendment balancing test. The four factors are:

(1) The scope of the particular intrusion,

(2) The manner in which it is conducted,

(3) The justification for initiating it, and

(4) The place in which it is conducted.

These factors indicate that the reasonableness of a given search is dependent upon the facts and circumstances surrounding that search. Thus, the Court concludes that the justifications or governmental interests promoted by a given search must also be considered in their factual context. As a result, the Court rejects defendants' argument that all situations involving contact visits with individuals from outside the institution should be held to be a categorically reasonable situation permitting a vbc search. Rather, the Court will consider the propriety of the vbc search in a number of separate settings.

■ 1. *Attorneys.* The use of vbc searches before and after attorney visits is troubling in that an inmate's fundamental constitutional right of access to the courts is involved in addition to his Fourth Amendment rights. *See Simms v. Brierton,* 500 F.Supp. 813 (N.D.Ill.1980). In view of recent Eighth Circuit precedent, *Hahn v. McLey,* 737 F.2d 771 (8th Cir.1984); *Nelson v. Redfield Lithograph Printing,* 728 F.2d 1003 (8th Cir.1984), inmate-attorney visits will play an important role in the process for vindicating prisoners' constitutional rights. As previously found, the use of vbc searches before and after attorney visits will have a chilling effect on the assertion of inmates' legal rights. In balancing the degree to which these searches promote security against the prisoners' privacy and due process interests, the Court concludes that these searches are unconstitutional unless there is some independent,

clear reason to suspect an individual lawyer or intern by reason of his or her past actions or statements.

2. *Legal interns.* The situation presented by legal intern visitors is similar to attorney visitors. Because of the burden the vbc search places on the right to access to the courts, the Court concludes that vbc searched before and after such visits shall be enjoined.

■ 3. *Clergy.* Clergy, like attorneys, must produce their credentials before they will be allowed to visit an inmate at ISP. Iowa Administrative Code Chapter 291–20.- 3(4). The Court concludes that these searches are unreasonable and, thus, unconstitutional.

■ 4. *Prison chaplain.* The prison chaplain is hired by the Department of Corrections and is part of the ISP staff. Requiring an inmate to submit to a vbc search before and/or after such a visit is unreasonable and shall be enjoined.

■ 5. *Ombudsman.* Similarly, the ombudsman is a state employee who presents no real danger of passing or receiving contraband from an inmate. Thus, vbc searches before and after such visits are unreasonable and shall be enjoined.

■ 6. *Infirmary.* The Court finds the use of vbc searches before and after an inmate visit to the new infirmary area is an exaggerated response to the security needs presented by the situation. Furthermore, the use of vbc searches has the effect of keeping inmates with legitimate medical needs from visiting the infirmary. A prisoner should not have to choose between getting medical relief and submitting to a vbc search.[4] The Court concludes that these searches are unreasonable and shall be enjoined.

■ 7. *University of Iowa Hospital.* In trips to the University Hospital, the inmates are in the same areas that are open to the general public. In crowded hallways, there may be physical touching between the inmate and someone the guard does not know. Furthermore, the computerized records of the Hospital make it possible for Hospital employees to find out when an inmate will be visiting the Hospital. This information can be passed to friends of the inmate. Some physical examinations of inmates are done outside the presence of a guard. In view of the many variables which may occur during a Hospital visit, the Court will modify the preliminary injunction so that vbc searches can be conducted at the Hospital both on arrival and upon leaving the Hospital. However, the use of the vbc search before leaving the prison on such a trip is unreasonable and shall continue to be enjoined. The Court has distinguished between vbc searches conducted before leaving the prison and those conducted upon arrival at the Hospital to lessen the burden on the right to medical treatment, i.e., to reduce the number of incidences where the records show an inmate refused to submit to a vbc search at the prison before leaving for the Hospital and thus was not allowed to make the trip to the Hospital.

■ 8. *Court (on prison grounds).* Two trailer houses inside the ISP fences but outside the prison walls serve as court facilities for certain legal proceedings which involve prisoners. This Court conducts its hearings and trials in many civil rights actions in those facilities. While in court, the inmates are always under the observation of at least one—and usually several more—correctional officers. In court the inmates' handcuffs and belly chains are removed. Leg restraints, if the inmate is in a status which requires them,

---

**4.** The defendants contend that the new infirmary area is poorly constructed and that reasonableness requires that a vbc search is therefore necessary on said visits. The thorough view of the premises made by this Court persuaded the Court that the chances of escaping from this area were very slim and none. They do have a very few "inside" room walls that would be considered "weak" when compared to a maximum security wall, but even if one of these could be "kicked" through, the prisoner would not be in any open area. Further, any such "kicking" in could be done, if it is possible, whether your anus had been checked or not.

are left secured. While in the witness room in the trailer house which is adjacent to the court room, the inmates are always under the supervision of one or more correctional officers and they remain in their restraints. In view of the restraints and supervision by correctional officers, the Court is persuaded that, in the context of vbc searches before and after court visits on the prison grounds, the security interests of ISP are not promoted by the use of the vbc search to a degree significant enough to outweigh the privacy interest of the inmates and vbc searches will not be conducted in these situations.

■ 9. *Court outside Prison.* Inmates on court visits are always in the close presence of at least two security guards and usually several more except when conferring with their attorney and sometimes when the security guard allows them privacy inside a restroom stall. The possibility that an attorney would allow an inmate to place or retrieve an item from his anal cavity is exceedingly remote.[5] Also, the chance that an attorney would give an inmate contraband which he could hide during a later trip to the restroom is minimal and remote. During court visits, the guards are much more in control of what happens with the inmate. This distinguishes court visits from Hospital visits. The Court concludes that vbc searches before and after court visits outside the prison are unreasonable.

■ 10. *Exercise.* The Court appreciates the frankness of the defendants' statement that:

Candidly, the Penitentiary policy of giving visual body cavity searches before and after segregated inmate's exercise is not as obviously constitutional as is the policy of requiring such searches in the cases previously described since infirma-

ry visits and exercise do not require the inmate to leave the prison and do not bring him into contact with people from outside the institution.

Defendant's Trial Brief, p. 19. Also, the testimony of Dr. Mintzes, formerly the warden at State Prison in Jackson, Michigan, and Warden Armontrout supports the conclusion that these searches do not advance the security of ISP to any significant degree. Given the surveillance of the exercise pens by correctional officers, the use of restraints to and from the exercise pens, the number of guards performing the escort, and the physical make up of the pens, the Court finds the use of vbc searches upon return from exercise is an exaggerated response to the perceived security needs of ISP. Consequently, these searches are unreasonable.[6]

■ With respect to verbal harassment during those vbc searches not prohibited by this Court's injunction, the Court concludes that verbal abuse and harassment can render an otherwise constitutional vbc search unconstitutional. In *Bell v. Wolfish,* 441 U.S., at 560, 99 S.Ct., at 1885, the Court stated:

Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. [*Wolfish v. Levi,*] 439 F.Supp. [114], at 147 [ (1977) ]. Such abuse cannot be condoned. The searches must be conducted in a reasonable manner. *Schmerber v. California, supra* [384 U.S. 575], at 771–772 [86 S.Ct. 1826, 1836, 16 L.Ed. 908 (1966) ]. But we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause.

(emphasis in original). In light of this language and the second of the four factors set forth on page 12 above, it appears that

---

5. It should be remembered that the prisoners in this situation have leg irons, handcuffs and belly chains on and can hardly move their hands. In open court, with many persons watching in close proximity, usually one hand is freed to allow the prisoner to write.

6. The exercise log sheets, as provided to the Court by counsel for the defendants, clearly demonstrate that many prisoners were refusing to go to exercise "DUE TO VIOLATIONS OF FOURTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS, I.E. RECTAL SEARCH REQUIREMENTS."

conduct by guards which increases the humiliation and degradation inherent in a vbc search and which does not promote institutional security cannot be tolerated. Consequently, this Court will enjoin correctional officers and other officials of ISP from teasing, making abusive or rude comments, or otherwise verbally harassing inmates during a vbc search.

### III.

■ A. Evidence and Procedure. On July 20, 1984, the plaintiffs filed a motion for leave to file amended and supplemented complaints. During the course of the trial, defendants made various motions to dismiss and strike evidence based on the assertion that the matters presented were not raised by the pleadings. The Court reserved ruling on defendants' motions to strike and motions to dismiss subject to the plaintiffs filing a motion for leave to amend. Under Fed.R.Civ.P. 15 and the Eighth Circuit precedent interpreting that rule, *E.g. Asay v. Hallmark Cards, Inc.*, 594 F.2d 692 (8th Cir.1979), leave to amend shall be freely given. The Court will grant plaintiffs leave to amend. The Court finds the defendants were not prejudiced by the amendment because this Court's preliminary injunction order entered well before trial clearly defined the various categories of vbc searches which were to be considered. The defendants were, at the time of trial, clearly prepared to address the various categories of vbc searches which were enjoined by the preliminary injunction. During the trial, the defendants moved to strike the testimony of Inmate Derl Sharp and moved to strike the testimony of Plaintiff Heaton. The Court reserved ruling on those motions and gave the defendants the opportunity to reassert their motions to strike after plaintiffs had amended their complaint. The defendants have not reasserted these motions to strike although given ample opportunity to do so. The Court will overrule the motions to strike and the testimony of Inmate Sharp and Plaintiff Heaton will be received as relevant evidence.

Defendants called as a witness Warden Bill Armontrout of the Missouri State Penitentiary which is located in Jefferson City, Missouri. Warden Armontrout testified, over the objections of the plaintiffs, about what two inmates had told him regarding knives which they kept hidden in their rectal cavities. The plaintiffs assert that this testimony should be excluded because, first, defendants failed to comply with requests for discovery regarding experts and, thus, said testimony should be excluded under Fed.R.Civ.P. 37(b)(2)(B) as a sanction for such failure and, second, the testimony of Warden Armontrout was hearsay that did not fall within one of the recognized exceptions to the hearsay rule.

The Court is not persuaded that it should exclude this testimony on the basis of discovery rule violations even though the rule was violated.

■ As to the hearsay objection, despite defendants' contention, the Court concludes that the testimony was offered for the truth of the matter asserted. The Notes of Advisory Committee to Rule 801 state:

> If the significance of an offered statement lies solely in the fact it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.

The practical thrust of Warden Armontrout's testimony was not that inmates say they hide knives in their anal cavity, but that inmates actually do hide knives in such a fashion.

■ Next, the Court concludes that the statement by the inmate about where he hid the knife is not a statement against interest as that phrase is used in Fed.R. Evid. 804(b)(3). The evidence does not show that the exact *hiding place* of the weapon is something which could subject the declarant to greater criminal or penal sanctions. Furthermore, the inmate declarants could easily have had a motive to deceive Warden Armontrout in an effort to preserve the secrecy of what the inmate regarded as a better hiding place. Consequently, the Court concludes that the state-

ments by the two inmates to Warden Armontrout do not fall within the hearsay exceptions set forth in Fed.R.Evid. 804(b)(3), 804(b)(5), or 803(24). Thus, plaintiffs' objections to the testimony by Warden Armontrout about statements made to him by inmates shall be sustained and that testimony shall be stricken from the record.

The practical effect of this hearsay ruling upon the defendants' case is minimal because the Court recognizes that it is possible for an inmate to conceal a properly wrapped weapon in his anal cavity. In addition, the plaintiffs do not contend that it is impossible to conceal a dangerous weapon in the anal cavity.

B. Standing. The defendants contend that none of the three named plaintiffs have standing to challenge the visual body cavity searches before or after visits to the University of Iowa Hospital, or before or after visits from an attorney, clergyman, or the prison ombudsman. Defendants' contention is premised upon the argument that the plaintiffs must have been subjected to a vbc search in making that particular type of visit before the plaintiffs would be entitled to a permanent injunction which prevents a vbc search before or after that type of visit.

█ Plaintiff Goff has standing to challenge the vbc searches before or after visits with an attorney. Plaintiff Goff's suit was initiated because he was required to submit to an anal body cavity search before being allowed to see his attorney. Plaintiff Goff refused to submit to the search procedures which were used at that time and, thus, was not allowed to see his attorney. Furthermore, the Court finds that the challenged vbc searches, if not enjoined, pose a threat of injury which is both real and immediate, as opposed to merely conjectural or hypothetical. The test for an actual "case or controversy" which the United States Supreme Court has adopted is that there be a threat of injury which is real and immediate, and not merely speculative. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675, 684 (1983). Defendants argue that plaintiffs' claim is based on "the speculative assertion that at some time in the future they *may* wish to engage in some of the activities covered by the visual body cavity search policy and upon that occurrence *may* be subject to a visual body cavity search." Defendants Post-Trial Brief, p. 18. First, part of the reasoning behind the present vbc search policy is that it is mandatory in certain situations and therefore does not give the prison guards the opportunity to exercise their discretion in an arbitrary or discriminatory manner. Second, plaintiffs cannot control when they will need the services of the University of Iowa Hospital. Also, plaintiffs are unable to control all the situations in which it would be desirable to speak directly with an attorney. Finally, and most importantly, plaintiffs should not be forced to choose between having their Fourth Amendment rights violated by an unconstitutional vbc search and foregoing a visit with an attorney (Due Process—access to the courts), a clergyman (First Amendment—freedom of religion), or the prison ombudsman (while access to the ombudsman may not implicate a fundamental constitutional right, it is important to inmates as a way to bring problems inside ISP to the attention of someone who is outside the institution).

C. Report. At the close of the evidence presented on July 16, 1984, the Court directed counsel for the defendants to report to the Court on the effect that the issuance of the preliminary injunction had on inmates who had been disciplined for refusing to submit to the squat and cough procedure. In part, the Court was concerned with whether the sanctions for refusing to submit to that anal body cavity search were suspended or eliminated by the administration after the injunction was issued. In a letter dated December 11, 1984, the Court was informed by defense counsel that the disciplinary segregation being served by Goff and Schertz was not suspended. Heaton was reported to not have received a disciplinary report as a result of the refusal to squat and cough.

D. Damages. The issue of damages was entertained at the trial. The Court requests the input of counsel regarding the manner in which that question should be handled; specifically, is there a need for a further hearing on damages?

IT IS THEREFORE ORDERED that defendants are hereby permanently enjoined from conducting visual anal body cavity searches in the following situations:

1. Before or after contact visits with attorneys, legal interns with a notarized letter of introduction from a licensed attorney, clergy, the prison chaplain, or representatives of the prison ombudsman's office.

2. Before going to or after coming from the prison infirmary.

3. Before leaving the prison on a trip to University of Iowa Hospitals. However, as a modification of the preliminary injunction, vbc searches can be conducted upon arrival at the Hospital and before leaving the Hospital.

4. Before or after attendance by inmates at court dates, whether on the prison grounds or in any other location, unless the inmate is out of restraints and actually beyond the visual supervision of ISP correctional officers. Private visits with attorneys shall not be considered as being outside the visual supervision or out of restraints.

5. Before going to or after coming from the exercise areas.

IT IS FURTHER ORDERED that the practice known as "squat-and-cough" shall be permanently enjoined from being used under any circumstances at ISP.

IT IS FURTHER ORDERED that correctional officers and other ISP officials shall be enjoined from teasing, making abusive or rude comments, or otherwise verbally harassing inmates during a vbc search.

IT IS FURTHER ORDERED that this Order does NOT prevent the defendants from conducting visual body cavity searches in the following situations:

(a) Before or after "contact" visits with any visitors coming to the prison except a set out above.

(b) Upon initial admission to the prison or before or after being outside the prison on furlough, transfer or work release.

(c) Before or after a segregated prisoner has mixed with the "general population" without supervision or restraints.

(d) Before or after an inmate, in any set of circumstances, has demonstrated activity which would give an official of the penitentiary of the status of Security Director or above a reasonably clear indication that an inmate is actually concealing something in his anal cavity. In any such situations, the burden will be on the Warden to show that the use of this exception was reasonable.

IT IS FURTHER ORDERED that this Order shall apply to all inmates at the Iowa State Penitentiary, not only to cellhouse 20 and 319 inmates.

IT IS FURTHER ORDERED that plaintiffs shall submit their pleadings setting out their position on damages within twelve days from the date this Order is filed. Defendants shall respond in six days.