**George GOFF, Appellee,**

**v.**

**Crispus NIX, Warden; Hal Farrier, Director of Corrections; Kurt Gary, Correctional Officer; Correctional Officer Matlock, Appellants. (Two Cases)**

**Nos. 84–1416, 85–1119.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1985.

Decided Oct. 9, 1986.

Rehearing and Rehearing En Banc Denied Jan. 20, 1987.

John M. Parmeter, Asst. Atty. Gen., Des Moines, Iowa, for appellants.

Barbara A. Schwartz, Iowa City, Iowa, for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

Plaintiffs George Goff, David Heaton, and Terry Schertz are inmates at the Iowa State Penitentiary (ISP) in Fort Madison, Iowa. Asserting causes of action under 42 U.S.C. § 1983, plaintiffs allege that the conduct of visual body cavity (VBC) searches by ISP officials as a condition of any movement outside their living unit or before being taken outside the confines of the ISP violated their rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. The District Court concluded that the VBC searches violated the Fourth Amendment.

The court entered permanent injunctive relief prohibiting State officials from enforcing the VBC portion of their strip search policy except under limited circumstances. We reverse except as noted below.

## I.

At the time of this suit, plaintiffs Goff, Heaton, and Schertz resided in ISP's segregation units, which prison officials describe as "prison[s] within a prison." Brief of Appellant at 26.[1] In separate *pro se* complaints filed in February and March 1984, plaintiffs challenged the VBC search component of ISP's strip search policy.[2] The VBC search portion of the strip search policy basically applies when an inmate enters or leaves the institution or the cellhouse if the inmate is in one of the segregation units, before and after contact visits or after exposure to general population inmates if the inmate is in a segregation unit, and any other time when there is a reasonable suspicion that an inmate is concealing contraband in a body cavity. *See* Policy No. 84–3–2–567(B)(10). The policy was implemented to insure that VBC searches are performed in a consistent and thorough manner. *See* Hearing Transcript at 70–71.[3] On February 29, 1984, Goff filed a motion for a preliminary injunction prohibiting the enforcement of this policy. After an evidentiary hearing held on March 15, 1984, the District Court entered a preliminary

1. ISP has two separate segregation units. Cellhouse 20 is the "close management" unit for inmates who have violated prison rules. It holds approximately 48 inmates. Cellhouse 319 is a non-punitive segregation unit that holds inmates for a variety of purposes, including those in protective custody and those who are being held for further prosecution. The record does not reveal precisely how many inmates are housed in this unit.

2. The prison strip search policy (Policy No. 84–3–2–567) indicates that its objective is "[t]o retard passing of inmate contraband and lessen the possibility of an inmate to conceal a weapon upon his person." The inmates are challenging portions of section B of the policy, which contains the VBC search procedures. Section C of the strip search policy states that "[f]ailure to conduct the search in this prescribed manner could cause injury or death to other persons" and instructs correc-

tions personnel not to "allow inmates to intimidate or compromise the effectiveness of the search. Failure of any inmate to be cooperative with all provisions of this policy is a violation of institutional rules...." Section D directs that "[i]f it is determined or reasonably ascertained that the inmate has contraband concealed in a body cavity," only a physician or physician's assistant may conduct further examination. The full text of the policy is set forth as Appendix A to this opinion.

3. Previously, ISP's practice had been to allow the corrections officers discretion to conduct random VBC searches. Warden Nix testified that he implemented the written policy at issue here both because of the complaints of some inmates that the previous practice had been applied in a discriminatory fashion and to insure that the searches were performed in a thorough manner. Hearing Transcript at 70–71.

order prohibiting ISP officials from conducting VBC searches as part of their strip search procedure before or after visits with attorneys, clergy, or the prison ombudsman, and before going to or after coming from medical facilities, court appearances, or exercise areas. *Goff v. Nix,* 627 F.Supp. 808, 813 (1986) (order granting preliminary injunction).

In assessing the searches at issue under the Fourth Amendment, the District Court balanced the need for the VBC searches against the invasion of personal rights resulting from those searches. *Id.* at 810; *see Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). ISP officials asserted that the VBC searches were vital to maintaining the security of the institution and of crucial significance in stemming the introduction of drugs, weapons, and other contraband into ISP and in preventing the transfer of those items between prisoners. The court, however, noted that the inmates at ISP were refusing in some instances the opportunity to visit with their attorneys and to exercise or obtain medical care. The court attributed this to ISP's VBC search policy. *Goff,* 627 F.Supp. at 811–12. The court's analysis then led it to conclude that use of the VBC search technique had an adverse effect on the inmates' exercise of their constitutional rights to access to the courts, to legal representation, and to adequate exercise and medical care. *Id.* at 812. In issuing the preliminary injunction, the court stated that the prison administrators' security concerns "may well be exaggerated and that the exercise of the inmate's consti-

tutional rights must take precedence.... The defendants have not convinced the Court that the security goals achieved by the vbc searches are so critical as to outweigh the exercise of inmates' constitutional rights." *Id.* at 812–13. The court further observed that "the possible addition of a few extra correctional officers, while somewhat of a burden to the defendants, is clearly a more reasonable alternative than to engage in a practice the effect of which is to deny basic human rights." *Id.* (footnote omitted).[4]

Subsequently, plaintiffs' actions were consolidated for trial, after which the District Court entered a permanent injunction, affirming the earlier order but modifying it to permit ISP officials to conduct VBC searches of prisoners entering or leaving the University of Iowa Hospitals. The Court's order also suggests that plaintiffs may have a claim for damages.[5] In reaching this result, the District Court first held that prison inmates retain limited Fourth Amendment rights while incarcerated. *Goff v. Nix,* 626 F.Supp. 736, 741 (1984). The court then found, essentially for the reasons stated in the preliminary injunction, that the VBC searches were unreasonable under the Fourth Amendment. *See id.* at 742–44. ISP officials appeal the District Court's ruling, contending that the District Court erred as a matter of law in ruling that the VBC searches violated the inmates' Fourth Amendment rights.[6]

## II.

We begin by taking note of the repeated instruction that the Supreme Court has giv-

4. The court also intimated that the VBC searches resulted in "cruel and unusual punishment" under the Eighth Amendment. *See Goff v. Nix,* 627 F.Supp. at 809.

5. The full text of the District Court's injunction entered after trial of this case on the merits is included as Appendix B to this opinion.

6. ISP officials also contend on appeal that the named prisoners do not have standing to challenge VBC searches in all of the contexts presented in this case. They argue that the likelihood of these plaintiffs being subjected to VBC searches in the situations dictated by the policy is "speculative" and therefore that they lack standing under *City of Los Ange-*

*les v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). This contention borders on the frivolous. The record shows that all three of the named plaintiffs have been subjected to the VBC policy and it seems not unlikely, given the situations in which the policy applies, that they will again be subjected to it. *Cf. Clark v. Brewer,* 776 F.2d 226 (8th Cir. 1985) (release from close management at ISP did not render case challenging continued confinement in that status moot because the case represented "one of a narrow class of cases that by its nature is 'capable of repetition, yet evading review' ").

en concerning judicial deference to the decisions of prison administrators. Although the Court has stated that "prisoners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration," *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984), the Court also has observed that " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (citations omitted). In addressing claims that prison conditions or policies violate the Constitution,

> courts must heed [the] warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell v. Wolfish*, 441 U.S. 520, 540–41 n. 23, 99 S.Ct. 1861, 1874–75 n. 23, 60 L.Ed.2d 447 (1979), *quoting Pell*, 417 U.S. at 827, 94 S.Ct. at 2806; *see Block v. Rutherford*, 468 U.S. 576, 583–85, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984). The Court further noted that judicial deference to prison administrators should be "wide-ranging," particularly in regard to "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878. Just this term, the Court stated that judicial deference to prison security measures extends "to prophylactic or preventive measures" and indicated that while this deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, ... it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice."

*Whitley v. Albers*, —— U.S. ——, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986).

The rationale for judicial deference has been explained by the fact that the management of corrections institutions is peculiarly the responsibility of the executive and legislative branches of government and by the fact that

> courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnote omitted); *see Wolfish*, 441 U.S. at 548, 99 S.Ct. at 1878. Thus we must recognize the "limited scope" of our review of the policies and practices of State prison officials, *Block*, 468 U.S. at 589, 104 S.Ct. at 3234, and that their decisions are entitled to considerable deference by virtue of not only their expertise but also because of the proper role of federal courts in supervising state institutions. We are mindful that prison administrators and officials are constantly in close contact with the prison population and we believe that this entitles their views to significant weight. In addition, principles of federalism counsel that we accord State officials wide latitude in performing their legitimate duties.

Rule 52(a) of the Federal Rules of Civil Procedure provides that an appellate court may set aside a district court's findings of fact only if they are "clearly erroneous," giving "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." To conclude that findings of fact are clearly erroneous, our review of the record must leave us with the "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). But we are also cognizant that to uphold the District Court's ruling, there must be "substantial

evidence" to indicate that the prison officials exaggerated their response to the perceived security concerns when viewed in light of the "wide-ranging" deference prison officials must be accorded in these matters. With these considerations in mind, we now proceed to address the constitutionality of the VBC search policy under the Fourth, Eighth, and Fourteenth Amendments.

## III.

ISP officials first assert that inmates do not have a legitimate expectation of privacy under the Fourth Amendment in being free from VBC searches. In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), a prisoner claimed that he had a reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment. In rejecting this claim, the Court observed that

[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.

*Id.* at 527–28, 104 S.Ct. at 3201 (footnote omitted). Although the Supreme Court never has addressed the issue directly, ISP officials contend that the logical implication of *Hudson* is that prisoners do not retain an expectation of privacy in being free from VBC searches. We need not decide whether inmates have a Fourth Amendment interest in bodily privacy, however, because we conclude in any event that the searches here do not violate that Amendment.

## IV.

■ Assuming for present purposes that the Fourth Amendment imposes some limitation on the ability of prison officials to conduct VBC searches of inmates, *see Wolfish*, 441 U.S. at 558, 99 S.Ct. at 1884,

we first will set forth the general standards under which the challenged policies must be reviewed, and then will discuss the general and specific facts that we believe authorize the searches at issue here in light of those standards. The Fourth Amendment prohibits only those searches and seizures that are unreasonable. In *Wolfish*, the Supreme Court upheld a prison strip search policy that required all inmates, including pretrial detainees, to submit to a VBC inspection after every contact visit with someone from outside the institution. Justice Rehnquist, writing for the Court, stated that

[t]he test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559, 99 S.Ct. at 1884. In applying this standard in *Wolfish*, the Court noted the serious security problems with which prison administrators must deal and commented upon the smuggling of contraband, including weapons and drugs, into prisons by inmate attempts to secrete those items in body cavities. The Court observed that there was only one instance in the record to indicate that inmates were attempting to smuggle contraband into the institution in this fashion but believed that that fact "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of inmates to secrete and import such items when the opportunity arises." *Id.* (footnote omitted).

Subsequently, in *Block v. Rutherford*, the Supreme Court highlighted the "limited scope of judicial inquiry under *Wolfish* " in matters such as the one now before this Court. 468 U.S. at 589, 104 S.Ct. at 3234. In *Block*, one of the questions presented was whether prison inmates had a constitutional right to contact visits. In addressing

this question, the Court limited its inquiry to "whether the prohibition of contact visits is reasonably related to legitimate governmental objectives. More particularly, because there is no dispute that internal security of detention facilities is a legitimate governmental interest, our inquiry is simply whether petitioners' blanket prohibition on contact visits ... is reasonably related to the security" of the facility. *Id.* at 586, 104 S.Ct. at 3232 (footnote omitted). This framework provides us some useful guidance in addressing the instant claims.

### A.

We believe that the District Court in this case both misperceived the limited scope of its inquiry under *Wolfish* and failed to accord that decision the precedential value to which it is entitled. Although the District Court paid lip-service to the *Wolfish* decision, the court did not even superficially attempt to explain how the present case is distinguishable from *Wolfish* in striking the VBC search procedures at ISP as violative of the Fourth Amendment.

We are unable to perceive any distinguishing characteristics that would serve to differentiate this case from *Wolfish*. The District Court noted at the time it issued the preliminary injunction that prison officials could "recall few, if any, instances where contraband was actually intercepted via a vbc search, despite testimony that such searches have been going on in random fashion for a number of years...." *Goff v. Nix*, 627 F.Supp. at 812. We have two observations in regard to this statement. First, the Supreme Court in *Wolfish* specifically rejected this rationale for invalidating VBC searches. The Court stated that the failure of VBC searches to uncover contraband could be attributed more to the deterrent effect of the searches than to inmate lack of interest

in smuggling contraband. *See* 441 U.S. at 559, 99 S.Ct. at 1884–85. Inmate attempts to smuggle contraband in body cavities have been documented frequently. *See Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. Second, Warden Nix testified that the policy was implemented to replace discretionary searches because under the earlier policy "only the weak, the poor and those who [were] not prima donnas" were being searched and that the new policy provided consistency of application and thoroughness in the searches. Hearing Transcript at 70.[7] We therefore are convinced that a valid reason prompted the implementation of the current policy and we are not inclined to upset it absent extremely persuasive reasons for doing so.

In balancing the interests articulated in *Wolfish*, we must weigh the need for the VBC searches against the intrusion upon the inmates' personal rights that accompany those searches. The prison officials assert that the VBC searches are a necessary component of their overall security policy and essential for the safety of prison visitors, ISP personnel, and the inmates themselves. According to prison officials, these searches help to prevent the introduction of contraband into the prison and retard its transfer once already there. As in *Block*, "there is no dispute that internal security of detention facilities is a legitimate governmental interest," and therefore our inquiry is simply whether the VBC search policy is reasonably related to the security of the prison. *See* 468 U.S. at 586, 104 S.Ct. at 3232.

█ The record in this case reflects what this Court and other courts know and long have acknowledged, namely that weapons, drugs, and other items of contraband are serious problems in our nation's prisons. The director of security at ISP testified that a substantial portion of the contraband

---

**7.** The prisoners contend that the fact that the prison implemented this policy in response to complaints concerning unequal application of the prior practice indicates that the routine use of VBC searches is not necessary. We disagree. We believe that prison officials are entitled to implement the type of policy at issue here to insure consistency of application and thoroughness of the searches even if the impetus for the policy was prisoner complaints of unequal application of searches conducted at the discretion of the corrections officers.

at the prison is introduced through contact visitation.[8] But the record also reveals that weapons and other potentially dangerous items such as handcuff keys are sometimes manufactured from materials already within the prison. *See* Hearing Transcript at 64. These considerations in particular deserve great weight in assessing the need for the VBC searches. The security concerns in this case are even greater in our view than those in *Wolfish*. Unlike the institution in *Wolfish*, ISP is a maximum security facility. The prisoners in this case are convicted felons instead of pre-trial detainees. The searches here apply in large part to inmates who are in segregation units because of their inability to conform to the prison rules. Moreover, the searches are not any more intrusive or demeaning than those in *Wolfish*.[9]

■ The public's interest in safe and orderly prisons is significant. The public is entitled to some assurance that prisoners cannot easily take hostages or escape. *See Block*, 468 U.S. at 586–87, 104 S.Ct. at 3232–3233. The Supreme Court has taken judicial notice of the unauthorized use of narcotics and other drugs that currently plagues our penal institutions, *id.* at 588–

89, 104 S.Ct. at 3234, and the high level of violent crime in our nation's prisons. *Hudson*, 468 U.S. at 526, 104 S.Ct. at 3200. It seems not unlikely that these two problems are in a significant sense related to one another and we are not inclined to question what we believe are the legitimate concerns of prison administrators who have made considered decisions concerning the measures necessary to protect the prison staff and the prisoners themselves and to preserve the order necessary for the prison effectively to perform its mission.

Against these legitimate and weighty concerns on the part of ISP administrators rests the invasion of the inmates' personal rights. While VBC searches admittedly are intrusive and unpleasant, a prison inmate has a far lower expectation of privacy than do most other individuals in our society. Plaintiffs argue that the fact that they are challenging only the VBC search portion of the strip search policy and not, for example, the portion of the policy requiring the inmate to lift his genitals for inspection of the crotch area indicates the "particularly traumatic nature of an anal search in a prison setting." Brief of Appellees at 10 n.

---

**8.** Judge Bright's opinion attempts to distinguish *Wolfish* in part on the basis that the District Court in the instant case found that the contact visits here occurred under close supervision. In *Wolfish*, the Court stated that the prison there used VBC searches as "an alternative to close and constant monitoring of contact visits." 441 U.S. at 559–60 n. 40, 99 S.Ct. at 1884–85, n. 40. The Court, however, did not indicate that if close supervision were employed, VBC searches then would be unreasonable. Subsequently, the Court in *Block* observed that visitors easily can conceal and pass contraband to an inmate and remain "unnoticed by even the most vigilant observers." 468 U.S. at 586, 104 S.Ct. at 3233. That significant amounts of contraband apparently pass through the visiting rooms despite close supervision is a strong argument in favor of deferring to the prison officials' considered decision that VBC searches are needed. Moreover, the ability of inmates to use a restroom located in the visiting room also undermines the District Court's conclusion that it would be nearly impossible for an inmate to hide an item in his rectal cavity during a con-

tact visit. We cannot say that the substantial evidence required to overturn the prison officials' decision exists here, particularly in view of the uncontroverted nature of the testimony concerning the means by which contraband enters the prison.

**9.** The District Court observed

that many of the correctional officers at ISP perform the vbc searches in an orderly manner without verbal harassment. However, the Court finds that some correctional officers, in some situations, conduct vbc searches in less than an appropriate manner. In other words, the evidence showed that some vbc searches are accompanied by teasing, rude and offensive comments, and other verbal harassment.

626 F.Supp. at 739. The court therefore enjoined the correctional officers and other ISP officials from engaging in such verbal harassment. We agree with the District Court that such verbal harassment is unacceptable. It is demeaning and bears no relationship to the prison's legitimate security needs, and we affirm the District Court in this regard.

7.[10] We think that this overstates the extent of the invasion of personal rights occasioned by these searches. The search is conducted in as private a location as security concerns will allow by an official of the same sex as the inmate. Policy No. 84-3-2-567(B). More importantly, the search is strictly a visual search unless either the contraband itself or evidence indicating the presence of contraband in that area is observable, in which case the inmate is held until he can be examined by a physician or a physician's assistant. We simply fail to perceive how a distinction can be drawn between the anal and genital regions for Fourth Amendment purposes and, were we to uphold the injunction issued in the present case, could see no principled basis for not extending it to cover the genital region were some challenge mounted to that portion of the strip search policy. Such a result would disrupt well-established security procedures in our prison systems and would no doubt engender greatly increased attempts to smuggle contraband in what would have become specific bodily areas accorded a preferred position under the Fourth Amendment.

The District Court found that VBC searches are "ineffective in revealing contraband except in cases where a string or part of the item hidden is protruding from the anus or where signs such as excess lubricant, blood or feces are present." 626 F.Supp. at 739. While this is unquestionably true, the record contains testimony indicating that contraband has been discovered in precisely this manner. Warden Frank Wood of the Oak Park Heights maximum security facility in Minnesota testified that

there were "numerous occasions where we have ... had an inmate who believes after he has had a contact visit that he has safely made ... a keister stash ... and when he gets into the search area, he bends over and spreads his buttock ... and [you can] see what is there." Hearing Transcript at 183. Additionally, we note that contraband would not necessarily have to be inserted to be transported in this area. We therefore need not find the District Court's factual findings clearly erroneous to disagree with the Court's ultimate conclusion concerning the efficacy of VBC searches, especially since it is clear that the court failed to give any weight whatsoever to the deterrent effect of a consistently applied VBC policy. *See Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884.

As the foregoing analysis indicates, we believe the prison officials have articulated substantial reasons for their policy which clearly outweigh the minimal additional intrusion of the inmates' personal rights resulting from the VBC searches. We therefore hold, based upon the general discussion above, that the VBC searches at ISP do not violate the Fourth Amendment.

**V.**

Within the framework of our general conclusions stated above, we now turn to the specifics of the injunction entered by the District Court. We will first consider those portions of the District Court's order pertaining to movement of prisoners outside the confines of the institution or outside their cellblock in the case of inmates in the segregation units. We then will dis-

---

**10.** A clinical psychologist testified on behalf of the prisoners that "one of the things that people [in prison] fear is homosexual attack, and the visual body cavity search serves the purposes of ... making him feel even more vulnerable...." The District Court characterized VBC searches as "intrusive, degrading, humiliating, embarrassing, and [as] greatly increas[ing] an inmate's feelings of vulnerability." 626 F.Supp. at 739. While we do not doubt these characterizations, we seriously question the extent to which VBC searches contribute to these feelings which to some degree necessarily accompa-

ny imprisonment. These matters obviously are pertinent to our consideration of the extent of the intrusion upon inmates' personal rights. We note, however, that these considerations were equally apparent to the Court in *Wolfish* and did not play a deciding role in that case. We are of the opinion that the District Court and the prisoners have exaggerated the extent of the additional invasion attendant to VBC searches, especially in light of the remainder of the strip search policy that the plaintiffs do not challenge.

cuss the District Court's rulings concerning visitation and exercise.

### A.

■ The District Court's injunction prohibits ISP officials from conducting VBC searches before transporting a prisoner to one of the University of Iowa Hospitals but allows VBC searches "upon arrival at the Hospital and before leaving the Hospital." The injunction also prohibits VBC searches before or after trips to the prison infirmary or attendance at court dates "unless the inmate is out of restraints and actually beyond the visual supervision of ISP correctional officers." The record contains evidence sufficient in our view to uphold the prison officials' decision to conduct VBC searches in all these instances.

In regard to inmate trips to the University of Iowa Hospitals, the District Court distinguished between VBC searches "conducted before leaving the prison and those conducted upon arrival at the Hospital to lessen the burden" on the inmates' constitutional right to medical treatment. 626 F.Supp. at 743. The court found that Hospital employees are able to determine when an inmate will be at the Hospital and can convey that information to friends or family of the inmate. The court noted that inmates are in the same areas of the facility as the general public and that they may come into contact with individuals who the guards do not know. Finally, the court determined that some examinations conducted at the Hospital were performed outside the presence of a guard.

Additionally, the record reveals that one of the named plaintiffs in this action, Terry Schertz, attempted to escape upon his arriving at the Hospital. When Schertz alighted from the van used to transport him to the Hospital, he "bolted," leaving behind his restraints. The correctional supervisor at the Hospital testified that Schertz admitted having a handcuff key with which he removed his restraints but that he dropped it while running, although Schertz denied at the trial that he had a handcuff key. II Trial Transcript at 157-

58, 188–89. In any event, the presence of contraband handcuff keys among the prison population is not disputed. *See* Defendant's Exhibit N (disciplinary report on Plaintiff Heaton for possessing a handcuff key). Obviously, allowing searches only after arriving at the Hospital could not possibly prevent this type of escape.

In light of the legitimate and serious security concerns about transporting prisoners outside the institution, we cannot agree with the District Court's order in regard to hospital trips. We have discussed the presence of both weapons and handcuff keys inside the institution. If prison officials are precluded from conducting VBC searches of inmates prior to transporting them to the hospital, those two items could combine to produce a very dangerous situation. An inmate's ability to escape or take a hostage would be increased greatly. For example, if Plaintiff Schertz had possessed a weapon when he attempted to escape, he might not have been captured so easily. We believe that the prison administrators' decision to conduct VBC searches prior to trips to the hospital is entitled to deference from the federal courts because of the significant evidence in this record supporting their judgment.

■ Although not strictly outside the confines of the prison, inmate visits to the prison infirmary pose similar if not identical concerns. The infirmary is outside the secure walls of the main prison. The District Court found that segregated inmates do not have access to general population inmates while at the infirmary and that they are in restraints and under constant supervision unless inconsistent with their treatment. The court concluded that the use of VBC searches before and after these visits was an exaggerated response to the security needs of the institution and stated that the searches had "the effect of keeping inmates with legitimate medical needs from visiting the infirmary." 626 F.Supp. at 743. The court felt that "[a] prisoner should not have to choose between getting

medical relief and submitting to a vbc search." *Id.* (footnote omitted).

While we are bound by the District Court's factual findings, we are not bound by the conclusions of law that it derives from those findings. First, we do not believe that the inmates' assertion that they are refusing, because of a particular prison policy, activities or services that enjoy some constitutional protection can serve to invalidate that policy if it is otherwise permissible. Second, we are convinced that, despite the seemingly close observation and restraint, prison officials have legitimate security concerns due to the availability of weapons and because the infirmary is not as secure as most other portions of the institution. This combination would make the infirmary a particularly attractive place for an inmate bent on escaping or taking a hostage. Further, prison officials testified that medical personnel at the infirmary are provided under contract and may not be as sensitive to security precautions as the prison administrators would desire. With these considerations in mind, we cannot say that there is the substantial evidence necessary to discount the concerns expressed by ISP officials.

■ Similarly, trips outside the confines of the prison for court appearances raise equally serious security problems. Friends or relatives of the inmate frequently are aware of court dates. While inmates may be well guarded and closely observed, the public nature of courts and the frequently crowded surroundings make the presence of a weapon that the inmate has managed to smuggle with him or that someone else has managed to secrete for him particularly dangerous. Again, substantial deference is owed to the judgment of the ISP administrators, and the record does not contain substantial evidence that would justify a court in substituting its judgment of the matter for theirs.

**B.**

■ The District Court ruled that the prison officials could continue to conduct VBC searches of inmates before and after contact visits except those with "attorneys, legal interns with a notarized letter of introduction from a licensed attorney, clergy, the prison chaplain, or representatives of the prison ombudsman's office." 626 F.Supp. at 747. The prison officials assert that VBC searches are equally necessary before and after these visits because an inmate might attack or take one of these individuals hostage and because of the possibility that one of these visitors might intentionally or inadvertently pass contraband to an inmate. The court found that "the chance that an inmate would wish to attack" one of these visitors "is exceedingly remote" and that "attorneys, clergy, chaplains, legal interns, and the ombudsman are not the type of people who smuggle contraband to inmates." *Id.* at 740. The court found that surveillance in the visiting area would make it difficult for an inmate to hide contraband in his rectal cavity. In addition, the court believed that VBC searches before and after attorney visits "would have a chilling effect on the assertion of inmates' legal rights" to access to the courts. *Id.* at 742.

We have already rejected earlier in this opinion, the elevation of the inmates' interest in being free of these searches because of the activities that are allegedly affected by them, such as visits with an attorney. *See supra* part V.A. Moreover, we see little value in such broad generalizations as the District Court made in concluding that the visitors listed in the injunction are not the "type of people" who would smuggle contraband. There is nothing in the record to support this conclusion, and this is hardly the type of adjudicative fact of which a court properly may take judicial notice. *See* Fed.R.Evid. 201. The uncontroverted testimony presented at the hearing and at trial was that most of the contraband that enters ISP is introduced through the visiting room. This contraband nevertheless manages to escape detection despite the heavy surveillance, and the identity of the particular visitors who bring it in is un-

known to the prison officials.[11] As the Supreme Court remarked in *Block*, prison visitors easily can hide weapons, drugs, or other contraband in numerous ways and deliver them to an inmate despite constant surveillance. 468 U.S. at 586, 104 S.Ct. at 3233. Given the serious problems that accompany contact visitation, we do not believe that we have any constitutional authority selectively to disapprove of VBC searches of prisoners in this context based on the identity or occupation of their visitors. *See id.*, 104 S.Ct. at 3232–33.

The prison officials testified that attorneys and clergy are admitted to the prison upon the presentation of their professional credentials and that the officials have no opportunity to conduct background checks or otherwise inquire about these visitors. The Supreme Court in *Wolfish* recognized that the VBC searches there were conducted after a contact visit with anyone from outside the facility, including attorneys. *See* 441 U.S. at 558, 99 S.Ct. at 1884; *id.* at 577, 99 S.Ct. at 1893 (Marshall, J., dissenting). Nothing in the record of this case gives us reason to avoid this aspect of *Wolfish*. Similarly, the Court in *Wolff v. McDonnell*, 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935 (1974), observed that "[t]he possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters." We doubt that we could find more clear indications absent direct instruction from the Supreme Court that the District Court's ruling in this case in regard to attorney visits is incorrect. We also see no reason that this logic would not apply to visits with members of the clergy. Likewise, the District Court's intuitive conclusion that inmates would not wish to attack these visitors or take them hostage cannot be sustained based on the record before us when weighed under the substantial evidence standard. The prison administrators' concerns are not insignificant and we defer to their judgment on these matters.

For similar reasons, we cannot agree with the District Court that the conduct of VBC searches before and after visits with the prison chaplains and the ombudsman are unreasonable. The pre-visit searches serve to protect these officials from attacks and attempts to use them as hostages. As to the post-visit searches, although it may be true that the prison chaplains and the ombudsman are unlikely to be involved in smuggling contraband to prisoners, there is nothing in the record to suggest that prisoners could not obtain contraband from other sources during visits with the prison chaplains and the ombudsman, and we therefore defer to the judgment of the prison officials that post-visit VBC searches also should be conducted.

## C.

■ The final portion of the District Court's order that we review pertains to VBC searches of inmates in segregation status after their exercise periods. The prison authorities insist that these searches are necessary to prevent the passage of contraband. Inmates in segregation units are strip searched before being taken to exercise pens located near their cellhouses. Each inmate is handcuffed with his hands behind his back and is escorted by one or two officers to the exercise area. Each exercise pen, which has a concrete floor and is surrounded by cyclone fence, is searched each morning before inmates are brought there. At times, only one or two officers may be available to observe as many as sixteen inmates during exercise.

---

11. The Plaintiffs rely on *Sims v. Brierton*, 500 F.Supp. 813 (1980). In *Sims,* the district court stated that "[t]here can be no doubt that requiring a body cavity search places an obstacle to plaintiff's access to the court. The state has conditioned access upon his submission to a procedure which the plaintiff believes to be unconstitutional." *Id.* at 815. This formulation, however, assumes the answer to the question, namely that the VBC searches are in fact unconstitutional. As we discuss in the text, we do not agree with this type of analysis because it elevates to constitutionally protected status the interest of an inmate in being free from a particular search solely because the inmate claims that he is refusing constitutionally protected activities because of that search.

The exercise pens also are observable from one of the guard towers and the escorting guards assist in observing the inmates when they are not otherwise occupied.

The record shows that plaintiff Goff once received a disciplinary report for receiving contraband from an inmate in the general population who threw the item over the fence of the exercise area. One of the prison guards observed this incident. *See* Hearing Transcript at 133. We believe that because of the possibility of this type of activity the prison officials have a legitimate security concern in relation to the exercise periods for inmates in segregation units. This security interest is heightened by the fact that at times only one or two officers are available to observe as many as sixteen inmates. We cannot say that the record contains substantial evidence that VBC searches upon the inmates' return from exercise will not deter or detect the passage of contraband.

## VI.

Finally, our views are in full accord with the decisions of other appellate courts considering the constitutionality of VBC searches. In reviewing the post-*Wolfish* case law from both our own and other circuits, we find two lines of cases. In one line of cases, courts routinely determine that VBC searches of prison visitors or pretrial detainees charged with traffic offenses or misdemeanors are unreasonable unless "reasonable suspicion" exists. *See Smothers v. Gibson,* 778 F.2d 470 (8th Cir. 1985) (prison visitor); *Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985) (same); *Jones v. Edwards,* 770 F.2d 739 (8th Cir.1985) (arrestee charged with violation of animal leash law); *Stewart v. Lubbock County, Texas,* 767 F.2d 153 (5th Cir.1985) (misdemeanor arrestees), *cert. denied,* —— U.S. ——, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Giles v. Ackerman,* 746 F.2d 614 (9th Cir. 1984) (minor traffic offense arrestee), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Hill v. Bogans,* 735 F.2d 391 (10th Cir.1984) (same); *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982) (prison

visitor). Our Circuit is among those courts that have adopted this approach and we express no disagreement with the results reached in these cases.

The second line of cases involves VBC searches of those who already have been convicted and who are incarcerated in facilities such as the one in the present case or of those who are pretrial detainees charged with felonies. We have found no appellate court decision declaring such searches unconstitutional. *See Campbell v. Miller,* 787 F.2d 217, 228 (7th Cir.1986) ("There is, moreover, no reason to think that the body-cavity search requirement has a significantly inhibiting effect on the motivation of inmates seeking access to legal materials."); *Dufrin v. Spreen,* 712 F.2d 1084 (6th Cir.1983) (pretrial detainee charged with felonious assault); *Arruda v. Fair,* 710 F.2d 886 (1st Cir.1983) (convicted prisoner in segregation unit of maximum security facility), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). In *Arruda,* the First Circuit declined to invalidate a prison policy requiring VBC searches for inmates in the security unit of a maximum security prison when they enter or leave their unit. The policy resulted in the inmates being searched in situations strikingly similar to the situations presented in the instant case: visitation, exercise, trips to the prison library or infirmary, and movement outside the confines of the institution. *See* 710 F.2d at 886; *id.* at 889 (Maletz, J., concurring in part, dissenting in part). As in the instant case, these searches were conducted even though each inmate was shackled and accompanied by two guards any time the inmate moved from his cell. The court in *Arruda* stated that "we do not believe that the factual distinctions to which Arruda points are sufficient to allow us to depart from the Supreme Court's result [in *Wolfish* ]. The injury to privacy interests is virtually identical; the "security needs" justification, in our view, is equally plausible." *Id.* at 888. We agree with these views and find nothing in the record of this case that serves to

distinguish it in any significant sense from either *Wolfish* or *Arruda.*[12]

To our knowledge the only cases in which VBC searches have been struck down are three district court cases. We earlier indicated our disagreement with the decision in *Sims v. Brierton,* 500 F.Supp. 813 (N.D.Ill.1980), concerning VBC searches of inmates before and after visits with attorneys. *See supra* note 11. The court in *Hurley v. Ward,* 549 F.Supp. 174 (S.D.N.Y.1982), determined that routine VBC searches were unreasonable in all circumstances other than after contact visits. In *Hodges v. Klein,* 412 F.Supp. 896 (D.N.J. 1976), the court held that VBC searches of inmates in segregation units before leaving and after returning to the units were unreasonable. The court in *Hodges* permitted VBC searches of an inmate upon his entering or departing from the institution and after contact visitation. We are, of course, neither bound by these decisions nor do we find them persuasive. We believe that the record in this case and the legal considerations set forth above lead inexorably to the conclusion that the VBC searches here at issue must be sustained.

## VII.

■ In their complaints plaintiffs also allege violations of the Eighth and Fourteenth Amendments. These allegations, however, were not explicitly addressed at trial and the plaintiffs have not raised these contentions on appeal. Therefore we address them only briefly. The Eighth Amendment prohibits "cruel and unusual" punishments. The Supreme Court has construed this language to proscribe punishments which inflict "unnecessary and wanton" pain or that "are grossly dispropor-

tionate to the severity of the crime." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981) (citations omitted). The Court has indicated that

> conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley,* 106 S.Ct. at 1084. We find nothing in the record here that would support a finding of a violation of the Eighth Amendment. Similarly, we do not find anything in the record that would support a finding of a violation of the due process clause. We therefore reject any claim that the VBC aspect of the ISP strip search policy violates these amendments.

## VIII.

Although we are acutely aware of the role of the federal courts in safeguarding constitutional rights, absent constitutional violations it is not the business of the federal courts to interfere with the management of state prison systems. The federal courts are not licensed to protect an amorphous set of "basic human rights" from state action, but only those rights that are rooted firmly in the Constitution. For the reasons set forth above, we reverse the judgment of the District Court and vacate the injunction except insofar as it prohibits

**12.** Additionally, the Iowa Supreme Court in *Williams v. State,* 378 N.W.2d 894 (Iowa 1985), held that VBC searches of inmates before exercise do not violate the Fourth Amendment. In *Williams,* the plaintiff was a prisoner in ISP's protective custody unit. After being disciplined for refusing to submit to a VBC search, the plaintiff sought relief in the State courts. The court in *Williams* noted that the VBC search was "only a slight additional intrusion" when considered as a part of

the entire strip search procedure. *Id.* at 899. The court concluded that "the prison officials acted within their discretion" and that the plaintiff's Fourth Amendment rights were not infringed. *Id.* at 899–900. Although the record in *Williams* was not as extensive as the one in this case, we find *Williams* persuasive support for the conclusion that the VBC searches enjoined by the District Court do not violate the Fourth Amendment.

the verbal harassment of inmates during VBC searches.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

A reader of the majority opinion may have some uncertainty over the precise question before this court. The term "visual body cavity" (VBC) search, used by the majority, could include the search of a prisoner's ears, mouth, or nose. That, however, is not what this case is about. Nor does it concern the privilege of prison officials to conduct generalized strip searches, and thereby closely examine naked prisoners. This case concerns the *routine use* of visual anal cavity searches at the Iowa State Penitentiary (ISP). These anal searches are conducted by requiring prisoners to "put their hands on their buttocks, bend forward at the waist, and spread the buttocks for a visual inspection of the anal area." *See* ISP Policy No. 84–3–2–567(B)(10)(b) (set forth in Appendix A). The ISP visual anal cavity search policy basically applies when a prisoner enters or leaves the institution, or the cellhouse if he is in one of the segregation units, before and after contact visits, or after the exposure to general population prisoners if the prisoner is in a segregation unit, and any other time when there is a reasonable suspicion that a prisoner is concealing contraband in his anal cavity.[1] The district court concluded that the ISP's routine use of visual anal cavity searches constituted an exaggerated response to security needs. It held that the searches were therefore unreasonable and in violation of those minimal fourth amendment rights that apply in a prison setting. The district court proceeded to enter carefully limited injunctive relief on behalf of the prisoners. *See* Appendix B. The majority, proclaiming the need to defer to the judgment of prison officials, reverses.

These searches are dehumanizing to the prisoners and must be revolting to the inspecting guards. This kind of procedure calls for exacting review by the courts if prisoners have any rights as human beings, and I believe they do. Here the district court's findings are well grounded on the evidence and its application of the law correct. Yet, in my view, the majority, in a cavalier fashion, overrules the district court and gives its stamp of approval to these unnecessary, demeaning inspections by the prison authorities.

### I.

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court articulated the balancing test to be used in determining the reasonableness of search procedures under the fourth amendment.[2] The Court stated:

The test of reasonableness under the fourth amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884–85. In my view, the district court correctly applied this approach in the present case.[3] It considered all of the elements in the balancing test,

---

1. The right to subject the prisoner to a visual search of the anal cavity on suspicion that the prisoner is secreting contraband items is not a subject of dispute here.

2. The majority assumes for purposes of this case that prisoners retain some limited fourth amendment interest in bodily privacy. I would affirmatively hold that, at a minimum, society recognizes a prisoner's expectation of privacy in his or her body as legitimate, and that therefore prisoners retain

at least this small degree of fourth amendment protection. *See Katz v. United States,* 389 U.S. 347, 360–61, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

3. I observe that the balancing test prescribed in *Wolfish* does not validate visual body cavity searches in prisons or detention settings *per se.* *See Jones v. Edwards,* 770 F.2d 739, 740 (8th Cir.1985).

made specific factual findings, and arrived at narrowly drawn conclusions based on those facts.

The majority, however, simply reduces the *Wolfish* approach to an inquiry as to "whether the VBC search policy is reasonably related to the security of the prison." Majority op. at 11. The majority seems willing, in applying this standard, to approve rigid visual cavity searches of the anus if it can imagine any colorable rationale for their use and to overlook the unlikelihood a closely-watched prisoner has any opportunity to hide contraband in his anal cavity.

In overturning the district court's injunction against the routine use of visual anal cavity searches when segregated prisoners return from exercise, the majority states: "We cannot say that the record contains substantial evidence that VBC searches upon the inmates' return from exercise will not deter or detect the passage of contraband." Majority op. at 22. I believe this demonstrates that the majority's approach improperly constricts the analysis required to determine the fourth amendment reasonableness of visual anal cavity searches.

In its analysis, the majority places little emphasis on the fact that the routine use of visual anal cavity searches at ISP was not established due to security concerns, but rather due to the discriminatory application of such searches by prison guards when the policy had been based on "reasonable suspicion." It seems appalling to me that ISP officials made no effort to educate and discipline prison guards, but instead spread the humiliation of the discriminatory abuse of the old search policy by replacing it with a policy of routine anal searches. This approaches punishment for protest rather than concern for security.

The key element in the *Wolfish* balancing approach is the need for a particular search. In the present case, the actual reasons for ISP's use of routine visual anal cavity searches belies the expressed concerns regarding security. *See Jones v. Edwards,* 770 F.2d 739, 742 (8th Cir.1985) ("security cannot justify the blanket deprivation of rights"). I take seriously the Supreme Court's statement that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). The loss of such rights are occasioned only by the *legitimate* needs of institutional security. *Cf. United States v. Cohen,* 796 F.2d 20, 23 (2d Cir.1986). In the present case, I believe that the majority simply gives too much credence to ISP officials' invocation of the spector of security.

At the same time, the majority pays too little attention to the invasion of prisoners' personal rights resulting from the routine use of visual anal cavity searches. The district court found that such searches are intrusive, degrading, humiliating, and embarrassing. Furthermore, the court found that such searches greatly increase a prisoner's feelings of vulnerability.[4] 626 F.Supp. at 739. The majority responds to these findings as follows: "While we do not doubt these characterizations, we seriously question the extent to which VBC searches contribute to these feelings which to some degree necessarily accompany imprisonment." Majority op. at 14, n. 10. Thus the majority dilutes the district court's factual findings based apparently

---

4. One of the prison's expert witnesses, Dr. Barry Mintzes, a clinical psychologist and former warden of the State Prison at Jackson, Michigan, with a long career in corrections, stated:

Within a prison environment, one of the— one of the things that people fear is homosexual attack, and the visual body cavity search serves the purposes of requiring an inmate to bend over and spread his buttocks and in effect psychologically mak-

ing him feel even more vulnerable because the one thing that most inmates tend to worry about in terms of going to prison. They tend to worry about homosexual assault more than they even worry about physical assault and psychologically tends to be more demeaning and tends to feel more humiliating and tends to leave inmates feeling more vulnerable.

Mintzes Deposition at 45–46.

on its own "hunch" regarding the effect of visual anal cavity searches on prisoners. In fact, the majority's logic seems to be that prisoners generally suffer degradation as human beings, thus a little bit more debasement is of no consequence.

On this theme, the majority suggests that the prisoners overstate the extent of the invasion of their bodies by the anal search inasmuch as the prisoners do not object to the visual inspection of the crotch and the prisoner's lifting of the genitals for that purpose. Majority op. at 13–14. I must reject that kind of reasoning. There is a substantial difference between a guard's search of a prisoner's frontside as opposed to a search of his backside; besides a heightened sensation of vulnerability, one's ability to protect oneself from unexpected attack is put at a distinct disadvantage. A recent case suggests that a prisoner's fear of physical abuse while his back is turned may not be unwarranted. *See McRorie v. Shimoda,* 795 F.2d 780 (9th Cir.1986). In *Shimoda,* a prisoner alleged that a guard attempted to plunge a riot stick into the prisoner's anus during a strip search in which he was ordered to turn his back to the guard and spread his legs apart. Moreover, it could well be the fact it is the second of two humiliating search procedures that causes the anal cavity search to violate the fourth amendment. It may well be, as it were, "the straw that broke the camel's back."

In sum, then, I believe the majority subverts the balancing of interests as articulated in *Wolfish.* I would affirm the district court's conclusion that routine visual anal cavity searches, in certain circumstances, were not necessary to prison security and were therefore unreasonable under the fourth amendment.

On review, this court is limited by the "clearly erroneous" rule. Fed.R.Civ.P. 52(a). We may not reverse the district

court's findings of fact unless our review of the record leaves us with the "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). The district court carefully considered the issue over many months, heard much testimony, toured the Iowa State Penitentiary, and tried the case on the Penitentiary grounds at Fort Madison, Iowa. The district court made specific factual findings based upon the record, and concluded that the routine use of visual anal cavity searches amounted to an exaggerated response to the prison administration's security concerns. In my view, a significant flaw in the majority opinion rests on the failure to comply with the dictates of the clearly erroneous rule. The majority has substituted its view of the facts for those found by the district court. Based on my review of the record in its entirety, the district court's factual findings are not clearly erroneous.

## II.

The majority's willingness to accord judicial deference to prison administrators' completely wide-open discretion in these searches undergirds its entire opinion. Therefore a brief comment is in order. Although the Supreme Court has repeatedly stressed the importance of judicial recognition of prison officials' expertise, and the need for deference to their judgment, such discretion is not absolute.[5]

The rationale for deference loses its force where there is substantial evidence in the record to indicate that the need for a particular security measure is unreasonable, or that prison officials had exaggerated their response to security concerns.

---

5. *See Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 321–22, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972) (per cu-

riam). *See also Rhodes v. Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble,* 429 U.S. 97, 102–05, 97 S.Ct. 285, 290–92, 50 L.Ed.2d 251 (1976).

*Wolfish,* 441 U.S. at 540 n. 23, 99 S.Ct. at 1875 n. 23; *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974); *Hill v. Blackwell,* 774 F.2d 338, 343 (8th Cir.1985). Judicial deference "does not insulate from review actions taken in bad faith and for no legitimate purpose * * *." *Whitley v. Albers,* —— U.S. ——, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). Moreover, "a policy of judicial restraint cannot encompass any failure to take cognizance in valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect the constitutional rights." *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974). As the Supreme Court stated in *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 1846, there must be a "mutual accommodation" between the important institutional objective of security and the constitutionally protected rights of prisoners.

In this light, I am concerned about this court's "apparent willingness to substitute the rhetoric of judicial deference for meaningful scrutiny of constitutional claims in the prison setting." *Block v. Rutherford,* 468 U.S. 576, 593, 104 S.Ct. 3227, 3236, 82 L.Ed.2d 438 (1984) (Blackmun, J., concurring in the judgment). "[C]areless invocations of 'deference' run the risk of returning us to the passivity of several decades ago, when the then-prevailing barbarism and squalor of many prisons were met with a judicial blind eye and a 'hands off' approach." *Id.* at 594, 104 S.Ct. at 3236.

The Arkansas prison cases can well demonstrate the result of this sort of judicial attitude. *See Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) and cases cited therein. As this court has previously recognized, in certain cases "judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons." *Martin v. White,* 742 F.2d 469, 473 (8th Cir.1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 354, 101 S.Ct. 2392, 2403, 69 L.Ed.2d 59 (1981) (Brennan, J., concurring in judgment) (emphasis in original). This represents one of those cases.

### III.

In its concluding paragraph, the majority implies that this case concerns only "an amorphous set of 'basic human rights'" beyond the protection of the federal courts. This case is certainly about human rights; and if it is true, as has often been said, that the manner in which a society treats its prisoners is evidence of the essential character of that society, then this case may have broad connotations.

Consequently, regardless of the outcome of this litigation, I suggest that the prison administration review its policies in light of appropriate goals of correction. If the search policy, demeaning in nature to the inmates—and I am sure distasteful to the guards—is discovered unnecessary, the policy should be changed, without any intervention by the courts.

In any event, for the reasons previously stated, I strongly dissent.

### APPENDIX A

Iowa State Penitentiary Policy No. 84-3-2-567, entitled "Strip Search Inmates," reads as follows:

PURPOSE:

The purpose of this policy is to outline the procedures for conducting a strip search of an inmate and the circumstances for which the strip search is warranted.

APPLICABILITY:

This procedure applies to all inmates and to all staff conducting strip searches of inmates at the Iowa State Penitentiary Correctional Complex.

OBJECTIVE:

To retard passing of inmate contraband and lessen the possibility of an inmate to conceal a weapon upon his person.

RESPONSIBILITY:

It is the responsibility of any staff member to conduct strip searches in this pre-

scribed manner whenever the situation demands or if the staff member has any reason to believe the inmate may be concealing contraband on his person.

PROCEDURE:

A. The strip search will be initiated under the following circumstances.

1. Whenever an administrative segregation inmate leaves his cell by escort.

2. Before and after all visits.

3. During a cell search of the inmate's cell.

4. Entering or leaving the institution.

5. Any inmate being transferred from general population to administrative segregation.

6. Upon suspicion:

a. Suspicious acts.

b. Investigative reports.

c. Other pertinent information.

7. Other circumstances as warranted per approval of the Shift Supervisor or higher authority. (If this section is implemented a "blotter" entry will be made describing the circumstances and the findings).

B. The strip search will be conducted by member(s) of the same sex as the inmate.

1. The inmate will be informed that he will be strip searched.

2. The search will be conducted in an area, as private as is possible, without jeopardizing the safety of the searcher(s), or the effectiveness of the search.

3. The inmate will be instructed to remove all clothing and hand it to one of the searchers.

4. While remaining in visual contact with the subject, (to prevent discarding any contraband) the clothing will be thoroughly searched and then set aside.

5. Subject will face the searcher(s), holding both hands in the air, palms ahead, and fingers spread apart. Slowly inspect the inmate from head to toe, looking for concealed items and needlemarks, etc.

6. Have subject shake out his hair and turn his head to the side so that the ear canal can be inspected, then turn his head so that the process can be repeated.

7. Then have subject open his mouth, stick out his tongue, and roll upper and lower lips.

8. Have subject lift penis and scrotum to inspect the crotch area.

9. While keeping his hands in the air, have the subject turn around and lift one foot at a time so that the bottom of the foot, arch area, and the toes can be inspected.

10. Visual anal check per following rules:

a. The visual anal check procedure is not to be used except under the following conditions:

(1) If the searching officers have reasonably clear indication or suggestion that contraband is being concealed in the inmate's body cavity, suspicious manners or movements by the inmate being searched, etc.

(2) Exiting the institution under staff supervision.

(3) Entering or returning to institution, if the inmate has not been under constant visual supervision or if inmate has been out of handcuffs.

(4) Inmate upon original placement, entering or returning to the cellhouse if the inmate has not been under continued visual supervision, has been out of handcuffs, and is in disciplinary status, Level A of Close Management, prosecutor's hold, summary segregation, or suicide status. (This includes leaving and returning from exercise.)

(5) Before and after all contact visits.

(6) During placement into any administrative segregation status.

(7) When any administrative segregation inmate returns to his cell after being in the general population unes-

corted (i.e. Close Management, Level B, yard exercise, or meals)

b. The correct procedure for the visual anal check is: The subject will put their hands on their buttocks, bend forward at the waist, and spread the buttocks for a visual inspection of the anal area.

c. If the inmate refuses the visual anal check procedure, the searching officers will keep the inmate under constant visual supervision while simultaneously contacting the D.W.O., the Security Director, or the O.D. for further instructions. When contacting this supervisor, the searching officers shall inform this supervisor of the conditions and circumstances by which the visual anal check procedures were implemented. This superior will then give further instructions, i.e. write a report, proceed without visual anal inspection, note as a refusal, etc.

NOTE: The inmate is to be under close visual observation from start to finish during the strip search procedures. 1[1]. The inmate's clothing is returned to him. Continue to observe him and do not permit him to pick up any item or disappear from your view before he is moved from the strip search location.

C. The strip search is an important duty for any staff that is charged with this responsibility. Failure to conduct the search in this prescribed manner could cause injury or death to other persons. Do not allow inmates to intimidate or compromise the effectiveness of the search. Failure of any inmate to be cooperative with all provisions of this policy is a violation of institutional rules and a disciplinary report must be written. If the strip search is being conducted in relationship to inmate movement and the inmate refuses to cooperate, the movement shall be suspended until proper authorities are notified. The subject will be kept under continual observation until instructions are received from those authorities.

D. If it is determined or reasonably ascertained that the inmate has contraband concealed in a body cavity, he will be placed in a sideroom of the hospital or an equally secure area until he can be examined by a Physician or a Physician's Assistant. Criteria for this determination can include:

1. Visual observation during strip search.

2. Refusal of the inmate to cooperate with all or part of the search.

3. Investigative information.

## APPENDIX B

IT IS THEREFORE ORDERED that defendants are hereby permanently enjoined from conducting visual anal body cavity searches in the following situations:

1. Before or after contact visits with attorneys, legal interns with a notarized letter of introduction from a licensed attorney, clergy, the prison chaplain, or representatives of the prison ombudsman's office.

2. Before going to or after coming from the prison infirmary.

3. Before leaving the prison on a trip to University of Iowa Hospitals. However, as a modification of the preliminary injunction, vbc searches can be conducted upon arrival at the Hospital and before leaving the Hospital.

4. Before or after attendance by inmates at court dates, whether on the prison grounds or in any other location, unless the inmate is out of restraints and actually beyond the visual supervision of ISP correctional officers. Private visits with attorneys shall not be considered as being outside the visual supervision or out of restraints.

5. Before going to or after coming from the exercise areas.

IT IS FURTHER ORDERED that the practice known as "squat-and-cough" shall be permanently enjoined from being used under any circumstances at ISP.

IT IS FURTHER ORDERED that correctional officers and other ISP officials shall

be enjoined from teasing, making abusive or rude comments, or otherwise verbally harassing inmates during a vbc search.

IT IS FURTHER ORDERED that this Order does NOT prevent the defendants from conducting visual body cavity searches in the following situations:

(a) Before or after "contact" visits with any visitors coming to the prison except as set out above.

(b) Upon initial admission to the prison or before or after being outside the prison on furlough, transfer or work release.

(c) Before or after a segregated prisoner has mixed with the "general population" without supervision or restraints.

(d) Before or after an inmate, in any set of circumstances, has demonstrated activity which would give an official of the penitentiary of the status of Security Director or above a reasonably clear indication that an inmate is actually concealing something in his anal cavity. In any such situations, the burden will be on the Warden to show that the use of this exception was reasonable.

IT IS FURTHER ORDERED that this Order shall apply to all inmates at the Iowa State Penitentiary, not only to cellhouse 20 and 319 inmates.

IT IS FURTHER ORDERED that plaintiffs shall submit their pleadings setting out their position on damages within twelve days from the date this Order is filed. Defendants shall respond in six days.

626 F.Supp. 736, 747 (S.D.Iowa 1984).