**UNITED STATES of America, Plaintiff,**

v.

**Robert OAKLEY, Defendant.**

**No. TH 89–10–CR–02.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Feb. 23, 1990.

Robert Stanley Powell, Asst. U.S. Atty., Office of the U.S. Atty., Indianapolis, Ind., for plaintiff.

James W. Boswell, Terre Haute, Ind., for defendant.

## ENTRY DENYING DEFENDANT'S MOTION TO SUPPRESS

TINDER, District Judge.

This is a story of remarkable self control. The origins of the legal dispute addressed in this entry may be somewhat scatological in nature but some genuinely interesting points of law are presented here.

The matter comes before the court on a motion to suppress filed on behalf of the defendant. He is seeking to have the court prohibit the government from introducing items at trial that were discovered during a digital rectal cavity probe conducted on him while he was incarcerated at a penitentiary of the United States. He also seeks suppression of other items which were subsequently discovered during the administration of laxatives to him at a nearby hospital.

A hearing was held on the motion, and explicit and graphic evidence of the procedures used by the government in this case was introduced. Based on that evidence, and the briefs and arguments of counsel, the court now issues its ruling denying the motion. Specific findings of fact and conclusions of law are set forth below.[1]

## FINDINGS OF FACT

As of April 23, 1988, the defendant Robert Oakley (Oakley or the defendant) was an inmate at the United States Penitentiary at Terre Haute, Indiana. (The residents and employees of this institution commonly refer to it as "the Hut", so for ease of reference, I will use this appellation throughout this entry.) Oakley was serving a sentence for mail theft imposed in the District of New Jersey.

Policies at the Hut allowed Oakley to have certain visits with non-inmates at regular intervals. A room was set aside at the Hut for these visits. The visitation room was set up to allow face-to-face or side-by-side visits, including limited physical contact between the visitors and the inmates. The room was also equipped with a closed circuit television system to permit the observation of the visitors and inmates during visits. The inmates were generally aware of the existence of the surveillance cameras. The television system was supplemented by the visual observations of correction officers who were stationed in the visitation room. Inmates are required to submit to a thorough search after leaving the visitation room, including a "strip" search and a visual body cavity search. These searches are conducted in what is called the "shakedown" room which is immediately adjacent to the visitation room.

In late March of 1988, Special Agent Robert J. Craig of the Federal Bureau of Investigation received a tip from a confidential informant indicating that Oakley would be receiving 100 Dilaudid (a controlled substance) pills during a visit from a girlfriend in April 1988. The informant described the pills as small in size, yellow in color and as being marked with the letter "K."

On April 23, 1988, Oakley visited with a female friend, Kazuko Cisluycis in the visitation room. The visit lasted from approximately nine in the morning until twenty minutes before three in the afternoon. Ms. Cisluycis and Oakley had lived together for approximately five years at some time prior to his arrest. During the visit, correctional officers observed Oakley reach into the jacket pocket of Cisluycis' coat with his right hand, move his hand to a potato chip bag and then move his hand to his mouth. These movements were done in a furtive manner. This was observed several times, perhaps as many as six in total.

Oakley went to the shakedown room upon completion of the visit where he was subjected to a strip search and a visual body cavity search. He was then taken to a Lt. Hanley's office where he was told that he was being placed in a cell called the "dry" cell rather than being returned to the general inmate population. He was told that the reason for this was that he was under suspicion of being in possession of contraband. The "dry" cell is a special cell at the Hut which is equipped with only a bed, which is bolted to the floor, and the usual cell accoutrements, including a metal sink and toilet. True to its name, the dry cell has no running water. Even the toilet is dry. The cell is used to hold inmates

---

1. If any of the findings should more appropriately be called conclusions of law, or if any of the conclusions of law should more appropriately be called findings of fact, or if there are mixed findings and conclusions, these determinations should be considered as what they truly are, regardles of their labels.

who are suspected to have ingested contraband so that the natural bodily functions can be monitored to recover evidence of the possession of contraband. The inmate is under constant personal surveillance by two correctional officers 24 hours a day. When the inmate needs to relieve himself, he is given a plastic bucket for that purpose so that the eliminated materials can be examined by the correctional officers. Only one inmate can be held at a time in the dry cell, and one leg of the inmate is shackled to the bed so that he cannot move around the cell at will.

The dry cell is approximately 6 feet by 14 feet, and has one window. An inmate in the dry cell is not permitted to watch television and is not permitted any visitors. Meals are brought to the inmate in the dry cell rather than permitting the inmate to dine in the usual dining area or with the general population. Oakley was fed regular meals while he was in the dry cell, and was allowed plenty of juices.

About four days after being placed in the dry cell, Oakley was permitted, under constant supervision by the correctional officers, to shower and have a short period of recreation.

On the morning of May 1, 1988, Oakley did not awaken and the correctional officers were unable to arouse him. He was rushed to Union Hospital in Terre Haute by ambulance, still under constant guard. He regained consciousness either at the hospital or while on the way there. While at the hospital, Oakley's lower abdominal area was X-rayed and his rectal area was examined by a physician. Oakley consented to that X-ray. The rectal exam consisted of a light digital probing, commonly referred to by the inmate population as a "finger wave."

Nothing unusual was found in this examination. Oakley was returned to the dry cell at the penitentiary.

28 C.F.R. § 552.11 authorizes federal prison authorities to perform body searches, including digital rectal searches, on inmates. That regulation provides as follows:

(c) *Digital or simple instrument search* —inspection for contraband or any other foreign item in a body cavity of an inmate by use of fingers or simple instruments, such as an otoscope, tongue blade, short nasal speculum, and simple forcep. A digital or simple instrument search may be conducted only by designated qualified health personnel (for example, physicians, physician assistants, and nurses) upon approval of the Warden or Acting Warden and only if the Warden or Acting Warden has reasonable belief that an inmate is concealing contraband in or on his person. If located, the contraband or foreign item may be removed immediately by medical staff if such removal can easily be effected by use of fingers or the simple instruments referred to above. Staff shall document all digital and simple instrument searches and the reasons for the searches in the inmate's central file.

(1) Staff shall solicit the inmate's written consent prior to conducting a digital or simple instrument search.

However, the inmate's consent is not required.

(2) Staff may not conduct a digital or simple instrument search if it is likely to result in physical injury to the inmate.

28 C.F.R. § 552.12 authorizes X-rays and other medical procedures on inmates, as follows:

§ 552.12 *X-ray, major instrument, fluoroscope, or surgical intrusion.*

(a) The institution physician may authorize use of a fluoroscope, major instrument (including anoscope or vaginal speculum), or surgical intrusion for medical reasons only, with the inmate's consent.

(b) The institution physician may authorize use of an X-ray for medical reasons and only with the consent of the inmate. When there exists no reasonable alternative, and an X-ray examination is determined necessary for the security, good order, or discipline of the institution, the Warden, upon approval of the Regional Director, may authorize the institution physician to order a non-repetitive X-ray examination for the purpose of determin-

ing if contraband is concealed in or on the inmate (for example: in a cast or body cavity). The X-ray examination may not be performed if it is determined by the institution physician that it is likely to result in serious or lasting medical injury or harm to the inmate. Staff shall place documentation of the examination and the reasons for the examination in the inmate's central file and medical file.

(1) The Warden and Regional Director or persons officially acting in that capacity may not redelegate the authority to approve an X-ray examination for the purpose of determining if contraband is present. An Acting Warden or Acting Regional Director may, however, perform this function.

(2) Staff Warden may direct X-rays of inanimate objects where the inmate is not exposed.

(c) The Warden may direct X-rays of inanimate objects where the inmate is not exposed.

The constant monitoring of Oakley in the dry cell continued until May 11, 1988, when he was taken to the prison hospital. He was told at that time that a Dr. Perry, a licensed physician employed at the penitentiary, had ordered that an X-ray be performed. Oakley refused to be X-rayed, but the procedure was performed anyway. Again, the lower abdomen was X-rayed. After the X-ray, Oakley was returned to the dry cell. Dr. Perry examined the X-ray and observed what appeared to be four or five balloons which were 1 to 1 and ½ inches long and ⅜ inches in diameter located in Oakley's lower abdomen. Dr. Perry was concerned about the danger of fecal compaction, so he obtained permission from Warden Calvin Edwards to proceed with a limited digital rectal cavity search of Oakley.

On May 18, 1988, Dr. Perry conducted an examination of Oakley's rectum, again through the insertion of a gloved finger into Oakley's anal opening. Prior to this examination, Oakley was informed by correctional employees Hanley and Johnson that such an exam had been authorized by the warden. Oakley was asked to consent to the exam but he refused to do so.

In preparation for the exam, Oakley was told by correctional officers that a digital rectal search was going to be performed. He was then handcuffed and turned on his stomach in the dry cell. His legs were also shackled to the bed. He resisted the exam, so he was held down and relatively still on the bed by three or four correctional officers. The exam, or at least part of it, was videotaped. Between eight and ten correctional officials were present in the dry cell during the rectal probe.

Dr. Perry used a lubricating material on the gloved hand in connection with the exam and briefly explained to Oakley essentially that the exam would not be painful if he would relax and not physically resist. The exam was a digital rectal cavity probe. Dr. Perry used no instruments and probed no deeper than his fingers would allow. The examination lasted no longer than one to two minutes.

Dr. Perry discovered and removed two balloon-like objects in Oakley's rectal cavity, both of which contained yellow pills with the letter "K" imprinted on them. A total of twenty pills was found. Dr. Perry suspected the pills to be Dilaudid, a Schedule II controlled substance.

A preliminary field test of the pills indicated that it was likely that they were Dilaudid. Subsequent laboratory chemical testing of these pills conducted by the Drug Enforcement Agency confirmed Dr. Perry's suspicion. This confirmation was not available until after all of the searches had been completed. However, Oakley does not dispute that the government had probable cause to believe that the pills were Dilaudid. His objections are based on the manner in which the pills were obtained.

The information regarding the results of the rectal cavity probe was relayed to Robert Craig, a special agent of the Federal Bureau of Investigation. Dr. Perry also expressed his concern about the danger of further fecal compaction and the possibility of the breakage of the remaining balloons (and subsequent ingestion of a large quan-

tity of powerful drugs into Oakley's system) if nothing were done to remove the other objects visible in the X-ray. Agent Craig then spoke to Oakley about the health dangers posed by the situation, including fecal impaction and the possible ingestion of a life threatening quantity of drugs. Oakley replied that he had no problem with that and he refused to consent to a further search of his rectal area. Craig then prepared the affidavit in support of a search warrant and submitted it to Chief Magistrate John Paul Godich of this district who issued the warrant on May 19, 1988.

The warrant authorized a search for controlled substances on Oakley's person and permitted the use of a local anesthesia, laxative therapy and/or colonoscopy under the supervision of a licensed physician in the exercise of medical judgment.

Oakley was again taken to Union Hospital where a laxative was administered to him. Then, on May 20, 1988, Oakley asked to use a toilet. In the course of a bowel movement, Oakley passed seven additional balloon-like objects. On the next day, he passed one additional such object. All of these eight objects, like the first two, contained Dilaudid pills.

Prior to being placed in the dry cell on April 23rd, Oakley had been taking a prescription medication called Seniquan, an anti-depressant. He was permitted to continue taking this medication while in the dry cell until May 2nd or 3rd when he was told that a supervisory correctional officer had ordered that the medication be stopped. The medication was resumed after he was released from the dry cell.

Oakley testified that he was permitted to shower only on the fourth day of his occupation of the dry cell and at no other time during the period of his confinement there. No other evidence was presented on this point.

Oakley had some small bowel movements during the first ten days in the dry cell. He asked for laxatives the last several days of that confinement and had light, loose bowel movements during his last few days in the dry cell. None of these bowel movements produced any objects containing drugs.

Prior to this incident, Oakley suffered from internal hemorrhoids which he was self-medicating with suppositories. He complained that this condition was aggravated by the rectal probes. Oakley verbally complained about being hurt several times during the probe, perhaps as many as three to five times.

Oakley did not tell Dr. Perry about his hemorrhoids, but assumed that this condition was disclosed in his medical files at the institution.

After Oakley had been in the dry cell for approximately eight days, he was visited by a Captain Johnson who mentioned that the correctional officers possessed the videotape of Oakley's visit with Cisluycis. Captain Cramer had previously mentioned to Oakley that an informant had tipped off the authorities. Prior to Captain Johnson's disclosure, Oakley was unaware of the existence of the videotape or of the ability of the correctional officials to tape prison visits.

Oakley complained that the dry cell was never cleaned while he was held there. He did admit that he was given a clean sheet two or three times during his stay there. Correctional officer Monte Chaney, who had been present during the digital rectal probe, also testified about the condition of the cell. He indicated that the cell was clean and did not present an unhealthy environment. Chaney indicated that there might have been some dust on the floor, but that in general, the room was not unkempt or soiled. The portion of the bedding depicted in the videotape of the rectal probe did not appear to be soiled or unsanitary.

## CONCLUSIONS OF LAW

Oakley has moved this court to suppress the evidence obtained from the rectal cavity probe and the laxative administration on grounds that the rectal probe constituted an illegal warrantless search and that the laxative administration was based on a warrant tainted by the fruits of this illegal

search. Oakley does not suggest that the warrantless search of his rectal cavity was performed in violation of the federal regulation that authorizes such searches, rather his argument is purely a constitutional one. Oakley also does not raise an Eighth Amendment cruel and unusual punishment claim; nor does he raise a Fifth Amendment due process claim.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The Fourth Amendment does not prohibit all searches, but only unreasonable ones. *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). As the Supreme Court pointed out in *Bell v. Wolfish*, "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). On the contrary, the test is one that requires the court to balance the "need for the particular search against the invasion of personal rights that the search entails." *Id.*

Although the Fourth Amendment provides no remedy on its face for persons injured by its violation, the Supreme Court has developed the exclusionary rule as a primary remedy. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Under the exclusionary rule, evidence obtained as a result of a search that is found to be unreasonable under this balancing test can be excluded from the criminal trial of the person whose fourth amendment rights were violated. Although this rule is not without its critics, both judicial and scholarly, *see, e.g., Bivens v. Six Unknown Named Federal Agents of Bureau of Narcotics*, 403 U.S. 388, 411, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Burger,

C.J., dissenting), or its limitations, *see, e.g., United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (evidence obtained as a result of search conducted pursuant to invalid search warrant need not be suppressed where police acted on a good-faith belief in the validity of the search warrant), it could force me to suppress the balloons and the dilaudid pills contained in the balloons that were removed from Oakley's rectum and his stool. Suppression of this evidence would, in all likelihood, result in a dismissal of the drug charges currently pending against Oakley.

Under normal circumstances, all warrantless searches are viewed as unreasonable per se. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). This case, however, does not present the normal circumstances. The Hut, like all federal prisons, is a "unique place fraught with serious security dangers." *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884. As a result, warrantless searches within the prison environment are not per se unreasonable. *Bonner v. Coughlin*, 517 F.2d 1311, 1317 n. 16 (7th Cir.1975) (Stevens, J.) (prisoner's claim that searches within prison require warrants was "obviously without merit"), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978)).

This is not to say that federal prisoners enjoy no fourth amendment protection. On the contrary, the Supreme Court has stated that the nation's prisons are "not beyond the reach of the Constitution." *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984). While prisoners lose some constitutional rights during incarceration, they lose only those rights that must be sacrificed to further legitimate penological needs. *Bonner v. Coughlin*, 517 F.2d at 1315.

■ Oakley argues that a search warrant should have been obtained in this case, and that the government's failure to obtain the warrant renders the search unconstitutional. Oakley's argument is of a type commonly referred to as a "less-restrictive alternatives" test. He argues that whenever a less-restrictive alternative search

(namely, one supported by a warrant) would be just as effective in meeting the government's interests in prison security, then the government ought to be limited to that less-restrictive alternative search. Oakley supports this argument by pointing out that the government's interest in maintaining a secure and drug free prison environment would not have been hampered in any way by a warrant requirement. Oakley had already been identified and removed from the general prison population. There was very little risk that the drugs would have made it past the scrutiny of the prison guards and into the consuming prisoner population. In short, Oakley asserts that any delay in the search resulting from the time spent obtaining a warrant would not have affected the prison's security.

Oakley's argument fails for two reasons. First, the Supreme Court has questioned the propriety of relying on less-restrictive alternative tests in determining questions of reasonableness. In *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–557 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976), the Court stated that "[t]he logic of such elaborate less-restrictive alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." Thus, the mere fact that the government could have performed this search in a less invasive manner without sacrificing its legitimate penological interests does not render the search unreasonable.

Second, even if Oakley's less-restrictive alternative argument were relevant to the question of reasonableness, Oakley's argument ignores the government's interest in preserving his own health. This interest would have been sacrificed by the requirement that the government obtain a warrant prior to conducting the digital rectal search. Oakley had swallowed into his digestive tract ten balloons containing dilaudid—a powerful chemical substance. The balloons had been in his system for over three weeks. There was a substantial risk that the balloons might break, and release a lethal dosage of dilaudid into his system. Fecal impaction posed an additional health risk. During the time spent obtaining a search warrant, Oakley might well have died or suffered a severe medical injury. Oakley cannot legitimately argue that the government has no interest in preserving his health or life. Clearly, the government may base a decision to conduct a warrantless search of a prisoner's body on legitimate concerns about that prisoner's health.

Thus, Oakley's argument that the government must be required to obtain a warrant whenever doing so would not hamper the realization of the government's interests is not a persuasive one. The argument has been rejected by the Supreme Court, and fails to take into account the effect that a warrant requirement would have on *all* of the government's interests.

Next, Oakley argues that even if a warrant is not required the search was unreasonable under all the circumstances. The reasonableness of a prison search is measured by the application of a four part test put forward in *Bell v. Wolfish*. "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." 441 U.S. at 559, 99 S.Ct. at 1884.

The government bears the burden of proving the search's reasonableness. *Bonner v. Coughlin*, 517 F.2d at 1317. As a result of the balancing test, the burden placed on the government is not a constant one, but one that grows heavier as the intrusiveness of the search in question increases. *Cf. United States v. Lilly*, 576 F.2d 1240, 1245–46 (5th Cir.1978).

The burden the government must shoulder in this case is a great one indeed, for invasions of a person's intimate bodily functions through force strikes at the center of the Fourth Amendment's protective shield. Justice Stevens, dissenting in *Bell v. Wolfish*, suggested that the body-cavity search was "clearly the greatest personal indignity." 441 U.S. at 594, 99 S.Ct. at 1902. (Stevens, J., dissenting). The Seventh Circuit has stated that body cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, un-

pleasant, embarrassing, repulsive, signifying degradation and submission." *Marybeth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir.1983) (quoted in *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir.1986) and *Blackburn v. Snow*, 771 F.2d 556, 564 (1st Cir.1985)).

A court must balance this paramount concern with privacy in one's own body against the government's interests in conducting the search. After considering how the facts of this case affect each of the four factors outlined in *Bell v. Wolfish*, I conclude that the government has met its burden of establishing the reasonableness of the search. Each of the four *Wolfish* factors are discussed below.

The scope of the invasion was limited to a digital probe of Oakley's rectum. No instruments were involved. The search took a few minutes to complete, with the doctor removing two balloons during this time.

The manner in which the search was conducted was not unreasonable and was in full compliance with the requirements of 28 C.F.R. § 552.11. The guards first asked Oakley to consent to the rectal search. After Oakley refused, several guards entered the cell and subdued him. He was placed on the bed face down with his hands cuffed behind him and his legs shackled to the bed. A medical doctor entered the cell, which did not appear to be unsanitary, and proceeded to probe Oakley's rectum with a gloved and lubricated finger. During the search, Oakley occasionally yelled out "ouch" and other expressions signifying that he was suffering pain as a result of the search. During the search, the doctor could be heard calmly advising Oakley that the probe would be less painful if he would relax.

One of Oakley's primary objections to the search was the fact that he suffered from chronic internal hemorrhoids which were allegedly aggravated by the search. The record does not indicate whether the doctor consulted Oakley's medical file prior to conducting the search, nor whether the file contained information regarding his history of internal hemorrhoids. Oakley admits that he did not advise the doctor that he was suffering from hemorrhoids. Although more evidence on this issue would have made the government's case stronger, failure to present this evidence does not render the search unreasonable. There was little likelihood that the doctor would have decided against the search on grounds that Oakley was suffering from internal hemorrhoids. Oakley's life was at risk as a result of the balloons blocking his excretory system. While Oakley's fears may have been assuaged had the doctor taken more time to explain the procedure to him or to re-assure him that his medical records had been consulted, the doctor's conduct during the search was not unreasonable.

The justification for the search was multi-faceted. As already discussed, the government had a legitimate interest in ensuring that drugs not be allowed into the general prison population and that Oakley himself not be allowed to ingest the drugs. It cannot be questioned that the body cavities of prisoners are capable of secreting a surprising array of objects, and that inmates are willing to go to extreme lengths to obtain weapons and illicit drugs. *See, e.g., Bruscino v. Carlson*, 654 F.Supp. 609, 620 (S.D.Ill.1987) (discussing the videotaping of two prisoners who were caught with hacksaw blades in their noses), *aff'd*, 854 F.2d 162 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *United States v. Lilly*, 576 F.2d 1240, 1243–44 (5th Cir.1978) (marijuana found in the vagina of one inmate, and cellophane envelope containing marijuana and a quaalude pill found in another female inmate's rectum). The fact that prisoners are willing to place such dangerous objects into body cavities that most people rarely display to others demonstrates as much about the guile and bravado of certain prisoners as it does about the government's need to search, both visually and physically, such private areas of the body.

In addition, the doctor had expressed concern over the risks posed by the presence of the drugs in Oakley's rectum. Oakley's health was at risk in part because

the balloons might rupture and also because he was suffering from fecal impaction. The doctor's fears were not unreasonable, considering Oakley's unconsciousness on May 1 which resulted in emergency hospital treatment.

Finally, the location of the search was the prison's dry-cell. Although the search might have been more properly conducted in the hospital clinic, I cannot say that failure to do the search there renders it unreasonable. The prison dry-cell was not unsanitary. The bed on which the search was performed, although not sterile, appeared to be reasonably clean.

Requiring the government to perform the search in the clinic would have presented at least two distinct risks not posed by the dry-cell search. First, Oakley would have had to have been moved to the clinic from the dry-cell. Movement in prison is rarely a risk free activity. Second, the search would have placed Oakley in an environment that was much less secure than the dry-cell. A dry-cell is designed to contain a prisoner who has swallowed balloons containing drugs. It is secure so that the escape of either the prisoner or the contraband is unlikely. In addition, there are no movable objects in the room that can be used as a weapon. Even the bed is fastened to the floor. The prison clinic presented a much different environment that could have posed a substantial risk to the guards or to the doctor, and ultimately to Oakley himself. Under all the circumstances, I cannot conclude that the decision to search Oakley in the dry-cell was an unreasonable one.

Certainly, some searches of a prisoner's body should be conducted in a prison clinic or even a hospital where access to complete medical services is immediately available. However, the type of search in this case was not so dangerous as to require it to be performed in a medical facility.

These four factors all suggest that the search was reasonable. This conclusion is supported by many courts that have considered the constitutionality of rectal searches on prisoners. Courts have routinely approved of visual searches of prisoners' rectal and genital areas. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Campbell v. Miller,* 787 F.2d 217, 228 (7th Cir.) (prisoners subjected to strip search and visual search of body cavities following visits to law library upheld over fourth amendment challenge), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Goff v. Nix,* 803 F.2d 358 (8th Cir.1986), *cert. denied,* 484 U.S. 835, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987); *Arruda v. Fair,* 710 F.2d 886 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983).

In *Daughtery v. Harris,* the Tenth Circuit approved of a policy in place at the federal penitentiary at Leavenworth, Kansas whereby all prisoners, regardless of suspicion, were subjected to a rectal cavity search immediately prior to being placed in the custody of the U.S. Marshal Service. 476 F.2d 292 (10th Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973). The searches in *Daughtery* were performed not by doctors but by paraprofessional medical assistants, and were not performed in a hospital or prison clinic but in a room in the basement of the Administration Building. *Id.* at 294–95. That court found that "rectal examinations are not medically dangerous as such." *Id.* at 295.

In *Bruscino v. Carlson,* Chief Judge Foreman of the Southern District of Illinois upheld a policy in place at the maximum security prison at Marion, Illinois, whereby all prisoners were subjected to physical rectal searches on a showing of reasonable suspicion and whereby prisoners located in the isolation or Control Unit were subjected to physical rectal searches upon reentry to the unit, regardless of suspicion. 654 F.Supp. at 619–21. Although the prisoners attacked the legality of the searches only on Eighth Amendment "cruel and unusual" punishment grounds, the court relied upon fourth amendment cases and broadly concluded that "the rectal search policy ... is constitutionally acceptable." *Id.* at 621.

Finally, in *United States v. Lilly,* the Fifth Circuit upheld a warrantless physical body cavity search of a female prisoner that was based on reasonable suspicion.

576 F.2d 1240 (5th Cir.1978). Although that same court also invalidated a search of a second female prisoner, the facts of that second search were substantially different from both the facts in the first case and the facts in this case. The second search was not supported by any particularized suspicion and the prisoner had not been notified that she would be subject to random physical searches following her return from an unsupervised release. *Id.* at 1246–47.

*Levoy v. Mills* can also be distinguished from this case on these grounds. 788 F.2d 1437 (10th Cir.1986). In that case, the court of appeals reversed the trial court's dismissal of a prisoner's § 1983 claim arising from a warrantless physical search of the prisoner's rectal cavity on grounds that the plaintiff's claim was not frivolous since it appeared that the search was conducted without any particularized suspicion.

These cases support my conclusion that the government has met its burden of proving the search reasonable under all the circumstances. The decision to perform a rectal cavity search on a prisoner is not one to be taken lightly, and was not taken lightly in this case. The government here acted reasonably in searching Oakley. Despite the great invasiveness of this type of search, the government's interests in preserving Oakley's health and in preventing the influx of drugs into the prison system justify the search. Oakley should not ignore the system's concern for his well-being—even if he, himself, had little concern for his own health at the time. The government acted reasonably in the initial warrantless search of Oakley's rectal cavity. The evidence obtained from that search and the subsequent searches may be admitted at trial.

■ Even if I am wrong in reaching this conclusion, there is an independent basis for denying Oakley's motion to suppress the evidence. Assuming for the moment that the warrantless search of Oakley's rectal cavity was an unreasonable search (a conclusion that I have already rejected) and assuming that the eight balloons subsequently recovered pursuant to the laxative administration should be suppressed as fruit of the poisonous tree, *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the inevitable discovery exception to the exclusionary rule would permit the government to use the evidence at Oakley's trial.

In *Nix v. Williams*, the Supreme Court explicitly adopted the inevitable discovery exception as a limit on the exclusionary rule. 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Nix*, the defendant agreed to show the police where he had hidden the body of a ten year old girl he had kidnapped and killed on Christmas Eve 1968. The defendant agreed to do so only after the police had illegally lectured him, outside the presence of his lawyer, on the need for a "Christian burial" for the girl. A search team combing the area near where the body was ultimately found was called off once the defendant showed the police where the body was located. The defendant sought to have the little girl's body suppressed at trial on grounds that it was fruit tainted by the illegal police conduct.

The Supreme Court, in rejecting the defendant's argument, held that the body need not be excluded from trial if the government could show its discovery was inevitable. Since the search team was only a few miles from the body and was moving toward the ditch where the body was found, the Court concluded that the body would have been discovered even without the defendant's assistance. *Id.* at 449–50, 104 S.Ct. at 2511–12.

Although police misconduct in *Nix* involved a violation of the Sixth Amendment right to counsel, the Seventh Circuit has applied the inevitable discovery exception to violations of the Fourth Amendment as well. *See United States v. Rodriguez*, 831 F.2d 162 (1987), *cert. denied*, 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988). Under the inevitable discovery exception to the exclusionary rule, the government bears the burden of proving the inevitability of discovery by a preponderance of the evidence. *Nix v. Williams*, 467 U.S. at 444–45 n. 5, 104 S.Ct. at 2509 n. 5.

The inevitable discovery doctrine has obvious applications to this case. The facts clearly show that Oakley was confined to a dry cell from the moment he left the visitation room until he had expelled all ten balloons from his system. There was very little chance that the balloons could have been expelled by Oakley while he was in the dry cell without the prison authorities discovering them. Although there may well be a practical, statutory or constitutional limit on the length of time that a prisoner can be confined to a dry cell, there is no evidence that Oakley was approaching this time limit. The government had reasonable grounds for suspecting that Oakley had swallowed contraband and had verified the presence of objects in his lower abdomen through the use of an X-ray.

Although physically and mentally capable humans learn at an early age to postpone the call of nature at most times, this control mechanism merely delays the inevitable release of our body's metabolic by-products. If Oakley was to survive, it was inevitable that he pass the balloons through his system. Once eliminated from Oakley's system, the balloons were destined for discovery by the prison authorities.

While I have found no cases that have applied the inevitable discovery exception in this fashion, I believe that the considerations behind the exception are well suited to this case. As the Supreme Court noted in *Nix v. Williams,* the primary motivation for the inevitable discovery exception is to avoid unnecessary penalties on the government. While the exclusionary rule prevents the government from gaining an unfair advantage through illegal misconduct, the inevitable discovery doctrine "ensures that the prosecution is not put in a *worse* position" simply because evidence that would inevitably have been discovered was discovered through illegal means. 467 U.S. at 443–44, 104 S.Ct. at 2508–09.

In *Nix,* the government proved the inevitability of the body's discovery by showing that the search team had systematically divided the area into small units and was methodically searching those areas with persons who had been specifically instructed on how to search effectively. Here, the government has shown that it had in place a system that had isolated Oakley and made the discovery of the drugs inevitable. The record itself demonstrates that the government was able to observe Oakley's excretory habits in distasteful detail over the course of his three week stay in the dry cell.

Significantly, the government need only prove by a preponderance of the evidence that the discovery of the drugs was inevitable. It need not eliminate *every* possibility that Oakley could have safely retained the drugs in his body indefinitely or that he could have surreptitiously excreted the balloons. The evidence produced at the hearing has convinced me that the discovery of the drugs was inevitable. Thus, even if the rectal cavity search was unreasonable, the evidence obtained through the search and subsequent to it need not be suppressed at trial.

### CONCLUSION

In conclusion, the doctor's digital search of Oakley's rectal cavity was not an unreasonable search under all the circumstances. Although any attempt by the government to invade the bodily integrity of a person is viewed with apprehension by this court, I cannot ignore the legitimate and overwhelming government interests supported by the search. The greatest of these interests was in preserving Oakley's health and ultimately his life. Although Oakley was apparently willing to risk death to avoid the discovery of the drugs, the Constitution should not be read as handcuffing the government's ability to provide prisoners with life-saving medical assistance without their consent.

Even if Oakley is correct in arguing that the search was unreasonably performed, the discovery of the drugs was inevitable. The government had in place a system that virtually guaranteed the drugs would be discovered the moment they were expelled.

On either of these alternative grounds, Oakley's motion to suppress the ten balloons, the dilaudid pills contained within

the balloons and all reference to this evidence can be, and is, hereby, DENIED.

ALL OF WHICH IS ORDERED.