**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert W. OAKLEY, Defendant–
Appellant.**

**No. 90–2677.**

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1991.

Decided Oct. 1, 1991.

Rehearing and Rehearing En Banc
Denied Nov. 14, 1991.

Deborah J. Daniels, U.S. Atty., C. Joseph Russell, Asst. U.S. Atty. (argued), Indianapolis, Ind., for plaintiff-appellee.

James W. Boswell (argued), Terre Haute, Ind., for defendant-appellant.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Defendant Robert Oakley brings this appeal from his conviction for possession of contraband in federal prison. Seeking reversal, he raises two issues, one alleging that his fourth amendment rights were violated and the other contending that the delay he experienced prior to trial violated the Speedy Trial Act. We affirm.

Oakley was a prison inmate at the federal penitentiary in Terre Haute, Indiana at all times relevant to this prosecution. In late March, 1988, agents of the Federal Bureau of Investigation learned from a confidential informant that the defendant would receive one hundred dilaudid pills from his girlfriend. On April 23, 1988, Oakley was visited by Kazuko Cisluycis (with whom he had lived for five years before his current imprisonment) in the prison visiting facility under the observation of several prison officials. In a visit lasting more than five hours, Oakley passed the time by munching on potato chips. Authorities became suspicious during the meeting, however, when Oakley began surreptitiously inserting his hand into Cisluycis's jacket pocket, then into his potato chip bag and finally into his mouth. Oddly, the snacks secured through these roundabout passes appeared to cause Oakley much more discomfort in swallowing than would an ordinary potato chip. The official onlookers suspected that the defendant was not swallowing chips at all, but contraband in an attempt to smuggle it into prison.

After Oakley voluntarily ended the visit with Cisluycis, prison officials escorted him directly to a "dry cell" (no running water), where he was to remain until discharging the suspected contraband. Oakley was monitored by prison employees 24 hours a day while any bowel movements were examined for the presence of contraband. He experienced only a few bowel movements during the first ten days in this dry cell and none during the following seventeen days, despite a physician-directed supplement of fruit juices and laxatives to his diet. On May 1, one week after his visit with Cisluycis, Oakley failed to awaken from sleep, prompting prison officials to take him to a local hospital. Neither a consensual x-ray taken of his lower abdomen nor a digital rectal exam at that time revealed the presence of any foreign objects.

Oakley was re-examined by x-ray in the prison hospital on May 11, and this time the x-ray revealed a blockage in his colon and the apparent presence of four or five balloons one to one-and-one-half inches in length. Nothing was done over the next seven days (during which time Oakley experienced no bowel movements), but on May 18 the prison physician reported that he feared the danger of fecal impaction. The doctor received permission from the warden to perform a second digital rectal search. Because of the defendant's challenges on appeal, we will recount the details of that search. Oakley did not consent to the procedure, so his arms and legs were shackled to the bed, stomach down and nude. When he continued to resist, four officers were called to restrain him. Four or more other officers were present in the twelve foot by six foot cell during the exam. The physician performed the exam with a lubricated glove, explaining the procedure to Oakley. All told, the exam lasted one or two minutes, and the entire procedure was videotaped and introduced at the suppression hearing.

The exam produced two small balloons containing a total of twenty pills, which were found upon testing to be dilaudid. On May 19, a warrant was issued authorizing the administration of a laxative or the pursuit of other medical procedures to locate any further items of contraband believed to be in Oakley's digestive system. Oakley was hospitalized for the administration of the laxative on May 20 and 21, experiencing several bowel movements which revealed eight more balloons filled with dilaudid. He was indicted for possession with intent to distribute narcotics in violation of 21 U.S.C. § 841(a)(1) (1988) and obtaining a prohibited object while a federal penitentiary inmate in violation of 18 U.S.C. § 1791(a)(2) (1988). After Oakley's motion for suppression was denied, 731 F.Supp. 1363 he was tried and convicted only of importing contraband into a federal penitentiary. The district court sentenced Oakley to a term of 40 months imprisonment (consecutive to his current term), three years of supervised release and 1,000 hours of community service. In addition Oakley was fined over $48,000, but that fine was ordered suspended in the event of successful completion of his community service.

Oakley asserts that the drug evidence recovered from his person on May 18 and May 20–21 was the result of illegal searches and should therefore have been excluded from his trial. The first search was illegal, he contends, because it was executed without a warrant or sufficient exigent circumstances, and because the scope and manner of the search were unreasonable. The second search was authorized by a warrant, but Oakley contends that the warrant was issued on the information illegally acquired from the first search, and is therefore fruit of the poisonous tree.

There may be aspects of the first search that could lend weight to Oakley's charges. The search was quite intrusive; one would be hard pressed to imagine a more invasive procedure than the cavity search carried out on Oakley without his consent. *Cf. Bell v. Wolfish*, 441 U.S. 520, 594, 99 S.Ct.

1861, 1902, 60 L.Ed.2d 447 (1979) (Stevens, J., dissenting) (calling a body-cavity search "clearly the greatest personal indignity"). The claim of exigent circumstances may miss the mark because of the delay permitted before conducting the search. Further, there is a question about nonparticipating officers watching the procedure. Thus, the implementation of the search could be challenged even if it were properly undertaken. However, since much of the drug evidence was recovered from the second search, which we find to have been clearly legal, we need not rule definitively on the propriety of the first search.

■■■ Oakley correctly notes that evidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391–92, 40 S.Ct. 182, 182–83, 64 L.Ed. 319 (1920) (Holmes, J.); *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir.1989). Nevertheless a search warrant which is procured only in part on the basis of tainted evidence is not necessarily invalid. Instead, we review whether "the untainted information, considered by itself, establishes probable cause for the warrant to issue." *James v. United States*, 418 F.2d 1150, 1151 (D.C.Cir.1969), *quoted in United States v. Johnston*, 876 F.2d 589, 592 (7th Cir.), *cert. denied*, 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989); *see also United States v. Salgado*, 807 F.2d 603, 606 (7th Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988). The defendant in *United States v. Johnston* was accused of stealing a boat under United States jurisdiction. The police acquired a warrant for the search of a boat on defendant's property, based in part on the serial number detectives had discovered in a warrantless search of that boat the day before. This court assumed *arguendo* that the earlier search had been illegal, but nevertheless upheld the warrant on the basis of circumstantial evidence of the defendant's wrongdoing: the defendant's knowledge of and access to the missing boat, the contemporaneousness of the boat's disappearance with

the defendant's registration of a similar boat and the use of a false seller's name on the registration papers. "The information remaining in the affidavit after excluding the observations by the detectives during their allegedly illegal search of the boat clearly provided the state court judge with the 'substantial basis' necessary to conclude that probable cause existed to issue the search warrant." *Johnston,* 876 F.2d at 592; *see also United States v. Whitehorn,* 813 F.2d 646, 649 (4th Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988); *United States v. Vasey,* 834 F.2d 782, 788–89 (9th Cir.1987).

 We face a similar situation in this case. The affidavit submitted to the judge to secure the warrant included a host of information. It recounted the tip from the informant about Oakley's plans to acquire narcotics. It described in detail the meeting between Oakley and Cisluycis and the confinement that followed. The affiant also described the result of the May 11 x-ray, when four or five balloons were spotted in the defendant's colon, and the physician's fear of the potential adverse impact on Oakley's health due either to blockage of his colon or the damage released contraband could cause if a balloon ruptured. Although the affiant did not say so explicitly, the affidavit made clear that in the 26 days since his ingestion of the contraband, Oakley had experienced few or no bowel movements. The affidavit also informed the judge of the circumstances and result of the rectal cavity search.

Even without the evidence of the first search, the affidavit presented the magistrate judge with sufficient evidence to merit the issuance of this warrant. First, the course of events left "a substantial basis for [the magistrate] to conclude that narcotics were probably present...." *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960); *see also Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). The mere inference arising from the defendant's refusal to defecate after the reported events in the visiting room might alone justify issuing the warrant.

Second, the degree of intrusion authorized by the warrant was small, and was specifically tailored to the particular circumstance of the defendant's case. Administration of a laxative may have been an uncomfortable experience for the defendant, but it was not an invasion of the same magnitude as the search carried out on May 18. Moreover, the judge specified a procedure that would both aid in the discovery of criminal activity and at the same time protect the defendant's own health. *See United States v. Borchardt,* 809 F.2d 1115, 1117 (5th Cir.1987).

Oakley does not dispute *Johnston's* rule, but instead protests that much of the other evidence on which we rely was also tainted. He claims, for example, that the special agent who submitted the affidavit did not personally learn of the impending drug transfer from the informant, despite the indication in the affidavit that he did. Oakley also asserts that the May 11 x-ray (which revealed the presence of balloon-shaped objects) was carried out without the proper authorization according to prison regulations. The defendant raised neither of these claims in his brief before the district court on his motion to suppress, relying solely on the illegal cavity search to invalidate the warrant. Defendant's Brief in Support of a Motion to Suppress at 12–13 (Sept. 22, 1989).

 Although Oakley did raise the prison regulations issue during closing argument in the suppression hearing, he had by that time already stipulated to the admissibility of the May 11 x-ray. That stipulation, along with the absence of any evidence to the contrary in the record even at this time, precludes us from addressing this argument. Additionally, the misstatement regarding the chain of information from the informant to the special agent affiant is not dispositive of the warrant's validity. Although accuracy in a warrant affidavit is important, an immaterial misstatement like that in this case will not invalidate an otherwise legitimate warrant. *United States v. Strauss,* 678 F.2d 886 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982); *United*

*States v. Reed,* 726 F.2d 339 (7th Cir.1984); *cf. Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The defendant does not dispute the accuracy of the informant's message as it was relayed to the magistrate judge, nor does he explain why the existence of an intermediary would taint the probativeness of the informant's message, given the apparent confirmation of that information by subsequent events. Corroborative efforts of officials investigating the case can turn an otherwise dubious informant's tip into a sufficient foundation on which a warrant might be issued. *Gates,* 462 U.S. at 241–43, 103 S.Ct. at 2333–35.

The search conducted on May 20–21 was carried out pursuant to a valid search warrant, and the eight balloons of dilaudid were therefore correctly admitted into evidence. Thus, regardless of any questions about the May 18 search, any error in admitting the first two balloons was harmless beyond a reasonable doubt.

■ Defendant also claims the proceedings below violated the Speedy Trial Act, 18 U.S.C. §§ 3161–74 (1988). Here Oakley ignores his own posture in those proceedings. In his motion for a continuance to prepare his case, dated August 11, 1989, Oakley explicitly waived his right to a speedy trial. Motion for Continuance at 2, Appellant's Br., app. at A–45. He did not reassert that right until his February 7 Motion for a Speedy Jury Trial. Even without another exclusion, this left only July 11 (the date of Oakley's indictment) to August 11 and February 7 to March 15 (when his trial began) as the relevant periods for Speedy Trial calculations. Together these amount to a period well within the act's maximum delay. Even had there been no waiver, we would reject Oakley's challenge to his trial date. Due to Oakley's motion for continuance and motion for suppression of evidence, the district court correctly excluded the block of time from August 7 until January 2 pursuant to sections 3161(h)(1)(F) and (J). The court disregarded another block of time from January 16 to March 15 due to Oakley's transfer to Pennsylvania for trial on charges pending

there. 18 U.S.C. §§ 3161(h)(1)(D), (H) (1988). The remaining relevant days do not add up to a violation of the Speedy Trial Act's proscription.

The judgment of the district court is AFFIRMED.